**Versa O. CLARK et al., and Intervenors, Donald Riggs and Billy Ray Jordan**

v.

**SOUTH CENTRAL BELL TELEPHONE COMPANY et al.**

Civ. A. No. 75–0526.

United States District Court, W. D. Louisiana, Shreveport Division.

Sept. 17, 1976.

Robert E. Piper, Jr., Frank E. Brown, Jr., Piper & Brown, Shreveport, La., for plaintiffs and intervenors.

T. Haller Jackson, Jr., Jeffrey P. Victory, Tucker, Martin, Holder, Jeter & Jackson, Shreveport, La., John C. Carey, Jr., Gen. Counsel, South Central Bell Tel. Co., Birmingham, Ala., for defendant South Central Bell.

R. Jan Jennings, Patrick M. Scanlon, Adair, Goldthwaite, Stanford & Daniel, Atlanta, Ga., Charles B. Peatross, Wilkinson, Carmody & Peatross, Shreveport, La., for defendants Local 10411.

## OPINION

STAGG, District Judge.

Plaintiffs and intervenors, black employees and former employees of South Central Bell Telephone Company, brought this action against the Company and the unions of which they were members, Communications Workers of America and its Local 10411, alleging a pattern of racial discrimination in hiring, assignments, and promotions. They sought to represent a large class of applicants, employees, and former employees whom they alleged were the victims of the discrimination.

On January 14, 1976, the Court denied class certification as to the Company due to a consent decree that it had entered in an employment discrimination suit in a Philadelphia, Pennsylvania, district court. *Equal Employment Opportunity Commission, et al. v. American Telephone & Telegraph Co., et al.*, No. 73–149 (E.D.Pa. Jan. 18, 1973). *See E. E. O. C. v. American Telephone & Telegraph Co.*, 365 F.Supp. 1105 (E.D.Pa. 1973), *aff'd* 506 F.2d 735 (3d Cir. 1974). The settlement provided broad injunctive relief designed to eliminate discrimination in each job classification. In its ruling of January 14, 1976, the Court relied on a similar holding involving the same decree and defendant. See *Smith v. South Central Bell Telephone Co.*, 518 F.2d 68 (6th Cir. 1975). Here, as there, the decree provides sweeping and adequate relief to correct discrimination by the Company against the class.

The same day the Court deferred certification of the class action as to the Union defendants until the trial on the merits. Thus, the case came to trial in an unusual posture, as a possible class action against the Unions but only as individual actions against the Company. In addition, of course, the named plaintiffs and intervenors stated individual claims against the Unions.

At the trial on the merits, plaintiffs' case consisted of defendants' answers to interrogatories, the testimony of the six named plaintiffs and intervenors as well as another ostensibly corroborating witness, and a witness who had prepared charts from the

answers to interrogatories and Company records. After plaintiff rested 13 separate motions were made by the defendants. In substance, the Unions prayed that the case be denied class action status and that all six individual claims be dismissed by directed verdict. The Company moved for directed verdicts with respect to all six individual claims. All parties argued the merits of their positions and the Court took the motions under advisement. On Monday, August 30, 1976, the Court ruled from the bench that the class action against the Unions could not be certified and that all individual claims would be dismissed by directed verdict. The Court advised all parties that it would prepare a written opinion summarizing its findings.

## I. CLASS ACTION STATUS

Rule 23, F.R.C.P., establishes the criteria for the maintenance of a class action. Rule 23(b) describes three types of class actions. A plaintiff need only bring itself within the bounds of one of the three to entitle itself to proceed as a class. Rule 23(a) requires that the purported class representative meet four requisites before the suit may be maintained on behalf of the entire class. In applying the criteria to a particular case, the trial court retains discretion to decide each case on its own particular facts and circumstances. *E. g., Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122, 1123 (5th Cir. 1969). See also *Green v. Missouri Pacific Railroad Co.,* 523 F.2d 1290 (8th Cir. 1975); *Arkansas Educational Association v. Board of Education of Portland, Arkansas School District,* 446 F.2d 763 (8th Cir. 1971). To exercise its discretion with care, this Court deferred its decision until plaintiffs completed their presentation of evidence.

Prior to 1966, the Federal Rules of Civil Procedure recognized true, hybrid and spurious class actions. To clarify the problems presented by the three types of class actions, Rule 23 was amended in 1966 to include the three types of action now within Rule 23(b)(1), (b)(2), and (b)(3).

Rule 23(b)(1) provides:

"An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: (1) the prosecution of separate actions by or against individual members of the class would create a risk of

"(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

"(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. . . ."

The standards requested in relief under any class claim in this case would be the same for the Unions toward all class members. Therefore, no risk exists that the Unions will be subjected to incompatible standards as against the individual members of the class. Thus, the class action is improper under the terms of Rule 23(b)(1)(A). Furthermore, the claims of the parties before the Court are of a wide variety, as would be the individual claims of the absent members. No decision as to the present parties would dispose of the claims of any absent parties. Indeed, the United States Court of Appeals for the Fifth Circuit suggests, and the parties to this litigation stipulated, that the proceeding in this case would be bifurcated. *United States v. United States Steel Corp.,* 520 F.2d 1043 (5th Cir. 1976); *Baxter v. Savannah Sugar Refining Corp.,* 495 F.2d 437 (5th Cir. 1974), *cert. denied* 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1975). Thus, if the Unions are liable in a Stage I proceeding, the individual class members must intervene to present their individual claims in Stage II. The class procedure as to individual members, then, is very little different than the procedures in individual actions. Therefore, the risk described in Rule 23(b)(1)(B) is not present.

Rule 23(b)(2) provides:

"An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: . . . (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. . . ."

The complaints of the various parties and intervenors plaintiff in this action allege acts or refusals to act on the part of the defendant Unions on grounds generally applicable to the class. However, as the Court will explain later in this decision, there is a decided lack of evidence to support those allegations. In fact, all the adduced evidence dealt with specific instances of conduct. No witness testified with respect to any policy or practice toward the class about which he had personal knowledge. Plaintiffs did not call a single Company or Union official to attempt to define any policy or practice. Hence, the action is also improper under Rule 23(b)(2).

Rule 23(b)(3) provides, in pertinent part: "An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: . . . (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions effecting only individual members, and that a class action is superior to other available methods for the fair and sufficient adjudication of the controversy. . . ."

In the case at hand, plaintiffs have presented no class claims at all, much less do class claims predominate. No testimony was elicited about any practice or policy, or the effect of that practice or policy on blacks as a class. Furthermore, class members will have to present individual actions under the Stage II proceeding if liability is found on the part of the defendant Unions, no litigation has already commenced by other class members, no reason appears to concentrate the claims in this forum, and, because many prospective applicants are not yet identified, management as a class action would be very difficult. Therefore, class action would also be improper under Rule 23(b)(3).

The four requirements of a Rule 23(a) commonly are known as numerosity, commonality, typicality, and adequacy of representation. This Court need not opine on the first three elements of Rule 23(a), as its decision may rest on whether representation of absent class members was adequate on the plaintiffs' case in chief.

■ The requirement that absent parties be represented adequately lies at the heart of the rationale that binds absent class members to a class judgment. Otherwise, to bind absent parties would deprive them of property without due process of law. *E. g., Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940); *Supreme Tribe of Ben-Hur v. Cauble,* 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921); *Smith v. Swormstead,* 57 U.S. (16 How.) 288, 14 L.Ed. 942 (1853).

■ The class action certification procedure of Rule 23(c) imposes a stringent duty on the Court to protect the interests of absent class members. The Fifth Circuit Court of Appeals has implied that certification procedure is extant at two stages, prior to trial and after the presentation of evidence. *Cf. Gonzales v. Cassidy,* 474 F.2d 67, 72 (5th Cir. 1973). The Court carefully must scrutinize the representation of the class members by named plaintiffs at every turn as a trustee for the absent putative class members. As a theoretical and a practical matter, the Court must be diligent in the discharge of its duty. Theoretically, the Court is without power to bind absent class members if it fails in its trusteeship. *E. g., Hansberry v. Lee, supra.* Practically, if the Court does not examine the facts carefully, its eventual judgment will be open to constant collateral attack and testing that would defeat the purpose of the class action. What constitutes adequate representation is a question of fact for each case on its own circumstances. *Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122 (5th Cir. 1969). Still, several cases illustrate the principles of adequacy of representation.

■ *Gonzales v. Cassidy,* 474 F.2d 67 (5th Cir. 1973), involved a collateral attack on a prior class action by the parties to a subsequent class action. However, *Gonzales* applies to the case at hand because the purpose of the class action and of class certification under Rule 23 is to ward off collateral attacks on class judgments, as in *Gonzales,* and to deny the success of those attacks. *Gonzales* establishes that there are two stages at which adequacy of representation is at question, prior to trial and after trial on the merits. The second stage of determination "involves a review of the class representative's conduct of the entire suit. . . ." 474 F.2d at 72. The primary concern of the Court in determining the adequacy of representation is the vigor, aggressiveness and effectiveness with which the class representative pursues and presents the case:

> "We hold that the primary criterion for determining whether the class representative has adequately represented his class for purposes of res judicata is whether the representative, through qualified counsel, vigorously and tenaciously protected the interests of the class." 474 F.2d at 75.

In *Wright v. Stone Container Corp.,* 524 F.2d 1058 (8th Cir. 1975), the trial court denied class certification because of the manner in which the purported representative presented the class claim and because of his failure to produce class evidence. The plaintiff there, it was held, failed to pursue class rights adequately. The Eighth Circuit Court of Appeals affirmed the trial court's determination.

*Eisen v. Carlisle & Jacquelin,* 319 F.2d 555 (2nd Cir. 1968) (*Eisen II*), also supports the principles of *Gonzales* and *Wright*. *Eisen II* states the importance of due process, citing *Hansberry v. Lee, supra.* It also states, however, that the Court should not deny certification summarily prior to trial on the merits. Rather, it should try to sustain the class action, at least until trial on the merits.

■ By what standards should the instant plaintiffs' representation be judged?

It must be vigorous, aggressive and complete. Adequacy of representation is a separate inquiry from whether the evidence supports the claim. If the evidence does not support the claim, the Court should certify the class and deny relief to protect the defendants, if the case is brought by a class plaintiff. But if the class case has not been presented fully, it would be unfair and unconstitutional to bind absent parties. If the judgment would not be binding on absent class members, any judgment would be an illusory safe harbor for the defendants. Once the Court determines that representation is inadequate to bind absent parties, then, the purposes of the class action are no longer served, and the Court should deny certification.

■ With respect to the class claim against the Unions in this case, much evidence that might have been presented was not presented and much of the evidence presented was faulty. The evidence not only does not state a claim, but it is so deficient that it raises an inference that something more exists than was placed before the Court. Hence, it would be a merciless denial of due process to bind absent parties based on the case as presented by these plaintiffs and intervenors. In particular, among other things, the Court found the following points on which no or insufficient evidence was placed before it:

(1) Plaintiffs presented no testimony in their case-in-chief concerning any overall policy by the Unions. All allegations and testimony dealt with individual cases. No witness testified as to any term of the collective bargaining agreement. No Union official was called to testify as to any Union practice. Certainly, at least that option was available to plaintiffs.

(2) The bare introduction of the collective bargaining agreements showed no policy or practice by the Unions or the Company that is discriminatory on its face.

(3) There is no oral testimony in the record that shows any effect on the class perpetuated by the Unions as a result of any of the terms of the collective bargain-

ing agreements; that is, there is no testimony that the Unions treated blacks any differently than whites, or that the neutral treatment somehow maintained the effects of past discrimination.

(4) Even if the Court assumed that the Unions could be held accountable for the Company's failure to hire blacks because of their race, no statistics have been offered and no testimony has been elicited that tends to show any overall policy of racial prejudice. For example, no numbers of applicants for various years were presented; only the testimony of some of the plaintiffs that they were not hired at first application vaguely gives rise to an inference of a racially prejudiced policy, and even then there is the mere allegation that whites were hired—there were no names, dates, places, or personnel records brought into evidence to corroborate the allegations. Plaintiffs could have obtained such data through pretrial discovery but did not do so.

(5) In the testimony elicited at trial, not a single plaintiff or witness could identify a single white who had been better represented or discuss a single situation in which a white received more aggressive representation by the Unions than did a black. Certainly plaintiffs could have discovered any existing situation of that sort through depositions and other pretrial procedure, yet they did not undertake these endeavors.

(6) There was no testimony or documentary evidence that showed that any bid was awarded on other than a company-wide seniority basis, one permissible under the case-law. That a white is awarded a bid over a junior black is not discriminatory when based on company-wide employment date seniority as it applies to the *Unions.*

(7) No plaintiff could name a single white who had received better treatment at the hands of the Unions than blacks.

(8) The testimony affirmatively shows that when a black held seniority and bid on a job, it was awarded to him or her. For example, Linda Lane and A. C. Whitaker received bids based on their seniority.

(9) There was no testimony or documentary evidence that whites were awarded bids on anything besides a company-wide, employment date seniority basis.

(10) Except for the testimony of A. C. Whitaker, plaintiffs presented no evidence that the Unions did not take each formal grievance to its furthest possible step.

(11) Plaintiffs introduced no evidence that the Union failed adequately to inform the class members of grievance procedures. Indeed, the record affirmatively shows that most of the witnesses were familiar enough with the procedure to have used it frequently.

(12) The International Union *never once* was mentioned in the testimony. Plaintiffs showed no relation to the local, nor did any witness discuss any failure of any duty on the part of the international.

(13) Nowhere in the testimony or the documentary evidence is there a single statement concerning the negotiation of the collective bargaining agreement. At least *some* fact should have been elicited, perhaps by calling a Union official to the stand, to show that the Unions had not pursued their responsibility to attempt to rectify discriminatory practices and policies. Indeed, no discriminatory policy or practice has been shown, much less a failure to rectify one. Plaintiffs neither called nor deposed a single Union official, and the subject of contract negotiations was mentioned only by A. C. Whitaker, who had no knowledge of negotiation procedures. The Unions need not affirmatively show their negotiating efforts unless they have been challenged by the evidence.

(14) Statistical comparison with respect to the class claims is impossible because:

(a) no population figures for the area were introduced into evidence, either for black population or for black labor force;

(b) the Court would not take judicial notice that "Caddo Parish has a black population of 30%" for the following reasons:

(i) The black population and, more importantly, the make-up of the black/white labor force, are not matters of general knowledge;

(ii) Federal courts have taken judicial notice of population figures only on the basis of recent United States census data. Furthermore, F.R.E. 201 states that facts may be noticed if they are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." For a Court to notice facts judicially, if they are not matters of general knowledge, the sources of those facts must be placed before the Court. If a party places the source before the Court and requests judicial notice, the Court must take it if the facts are susceptible of judicial notice. No facts or reliable sources were placed before the Court in this instance.

(iii) The geographical area of this lawsuit is not confined to Caddo Parish, but extends over several parishes. The black population of Caddo Parish, therefore, would be an inappropriate figure to which to compare the South Central Bell statistics.

(15) The statistics are not broken down into union and non-union jobs. If, as plaintiffs claim, management positions are held by virtually all whites, the statistics are invalid to the extent that they would overemphasize white/black ratios, introducing a number of all white managerial jobs for which the Unions are not responsible. The same is true for average income, since the higher managerial salaries would raise the white average, rendering an unfair comparison to the almost exclusively blue collar black average.

(16) The statistics as to each particular job might be labeled by the Court as union and non-union, even though the plaintiffs' case did not do so. But then the number in the statistical sample for individual jobs would be so small that elementary statistical theory would dictate that any company-wide conclusion based on the sample would have an impermissibly high margin for error. Hence, especially in light of the absence of any population figure, the statistical breakdown by job cannot bear plaintiffs' burdens for them.

In short, the Court was faced with a massive failure to present proof by the parties that seek to represent absent class members. In light of that circumstance, the Court had no alternative but to deny certification of these claims as a class action against the Unions.

## II. THE INDIVIDUAL CLAIMS

■ The burden of proving discrimination in an individual action alleging employment discrimination lies with the complainant. He or she must prove that whites were treated differently, or represented better, or paid more when placed in similar situations to blacks. The plaintiff must prove that he or she was victimized by a policy or an act of racial discrimination directed at her or him. *Thomas v. J. C. Penney Co., Inc.,* 531 F.2d 270 (5th Cir. 1976). Applying that test to this case, each of the individuals must prove that a white was or would have been treated differently than he or she was. All six plaintiffs and intervenors failed to meet that burden.

### A. Versa Clark

Mr. Clark was an original plaintiff in this cause. He worked with South Central Bell for a period of time and then resigned due to his working conditions. His major complaint was about job assignments.

Mr. Clark claimed that he was assigned to an out-of-town work site for five of his first twelve months with the Company. No doubt he was. However, his testimony shows that whites also were assigned to out-of-town job sites, and his testimony contained no statement about whether whites were assigned in greater or lesser proportion than Versa Clark to the out-of-town jobs. Thus, the Court had no basis to conclude that the out-of-town job assignments were made because of Mr. Clark's race.

In another instance, Mr. Clark testified that he sought a promotion and received the bid for it. To maintain the promotion

he successfully had to complete a school in New Orleans, which he did not complete. Upon his return, the Company assigned him to a supply job, rolling reels and emptying trash cans. No doubt the job was less desirable than his previous position; but he testified that he was told that no jobs were available in his former position and that Rene Aucoin, a white who had failed the school, was placed in the same job after terminating and being rehired. Moreover, he said that two whites and three blacks were assigned to the same position. The Court cannot conclude that a 2:3 ratio is discriminatory when the balance could not be closer mathematically. The testimony showed no different treatment afforded to Mr. Clark from that afforded his white counterparts.

Mr. Clark further testified that he had been ordered to climb a pole that he thought was unsafe to climb. The incident occurred among a group of white employees, none of whom were asked to climb the pole. Upon Mr. Clark's refusal to climb the pole, he offered to get a ladder to do it. The supervisor allowed him to do it with the ladder. Thus, no occasion arose for the supervisor to ask or not to ask a white employee to do the same thing. Mr. Clark said that the supervisor told his superior about the incident, but no disciplinary action arose as a result of it.

As to the Company, Mr. Clark showed no different treatment between himself and white employees. No other witness corroborated his claims, but the Court need not concern itself with that, for even if his testimony is true, it fell short of a *prima facie* case of employment discrimination due to race. Mr. Clark did not show a single white person who received better treatment.

With respect to the Unions, he never filed a grievance nor did he ever seek Union assistance with his employment problems. In short, no evidence was presented that showed any relationship between the Unions and Mr. Clark. He proved no case against the Unions.

Because he failed to prove a *prima facie* case of employment discrimination, the motions by the defendant Company and Unions for directed verdicts were meritorious.

**B. Joe Williams**

Joe Williams had the longest and most vocal of the complaints against both the Company and the defendant Unions. He first complained against both about a suspension for allegedly fraudulent vouchers on his expense account. The Company reinstated him after the claim had gone through all stages of the grievance procedure and, finally, to arbitration as a result of his representation by the Unions. After arbitration, Mr. Williams received retroactive seniority, but he did not receive his "wage credit seniority" or back pay. This, Court refused to disturb the arbitration award, as there was no showing that the arbitrator or his award was racially motivated. Moreover, the parties stipulated in the pretrial order that the arbitration award and the matters contained within it are *res judicata.*

■ The Unions took Mr. Williams' complaint as far as possible. Under the collective bargaining agreement, the last grievance procedure was arbitration. The Unions, perhaps, could have taken the case to court in order to attempt to overrule the arbitrator, but only the most severe of circumstances would have justified that course of action. Mr. Williams did not show any circumstance that would support such a drastic measure. The Unions did not fail to discharge any duty to Mr. Williams with respect to the arbitration. There is no evidence that the Unions did, or would have done, anything further for a white employee than it did for Mr. Williams.

The Court found that all matters regarding the suspension and reinstatement incident for the allegedly fraudulent expense account vouchers were concluded by the arbitrator's award. They could not comprise an individual case of employment discrimination at this time in this Court.

■ The second major complaint of Joe Williams was that he was not hired when

he originally applied. However, he introduced no personnel records or other evidence besides his own testimony of the date on which he was refused employment. Moreover, he did not testify, nor did any other evidence show, that at the time he was refused employment whites were hired. On that basis, the Court could not conclude that he was refused employment due to his race. Thus, the failure to hire Joe Williams cannot, absent a showing that whites were hired at that time, comprise a *prima facie* case of employment discrimination.

The final complaint of Joe Williams concerned harassment and a lack of cooperation among his supervisors and his co-employees. He testified that he could not get along with his supervisors. He gave to the Court a list of eight or nine white employees with whom he did not get along and with whom he would not cooperate.

■ On the first level, he complained about racial slurs and jokes. However, no evidence was presented that the Company encouraged or condoned such activity; in addition, no evidence was presented that the Union encouraged or condoned that activity. The Court could not hold the Company or the Unions responsible, at their peril, for the individual attitudes of employees and union members.

With respect to his supervisors, Mr. Williams did not name a single white person with whom he could communicate and cooperate. To the contrary, he showed that he did not get along with white employees at all. His testimony tended to show his own problem in dealing with whites, rather than a policy or practice on the part of the Unions or the Company. His lack of promotion, the Court found, was due to his own poor working relationship with his supervisors, not because all of them "had it in for him". His own failure to cooperate and to communicate and to develop a good working relationship with his supervisors is not a matter that states a *prima facie* case of employment discrimination.

With respect to his claim against the Company, there was no showing of racial discrimination. The evidence reflected his poor attitude with respect to all of his supervisors; he simply did not like to take any orders from anyone. He did not prove that the Company in any way took a racially impermissible position with respect to his employment or his promotion.

As concerns the Unions, the evidence revealed that he was fully represented by the Unions. The Unions took his case to arbitration in one instance. They never failed to process a grievance, they even helped him to file all of his grievances. In 19 months of his employment with the telephone company, the Unions processed eight or nine grievances for him. Moreover, he did not show that any white employee received any better treatment at the hands of the Unions.

Mr. Williams failed to show that he was treated any differently than any white employee at the hands either of the Unions or of the Company. Therefore, he failed to prove a *prima facie* case of employment discrimination.

C. Linda Lane

■ Linda Lane did not file a charge with the Equal Employment Opportunity Commission. Therefore, her only claim before the Court was a claim arising under 42 U.S.C. § 1981. Ms. Lane was hired the first time she applied. She currently works at the telephone company and is a member of the Unions. Her only complaint was that she missed promotions because of her lack of seniority. The evidence shows that the seniority system maintained under the collective bargaining agreements is a company-wide employment-date seniority system. Such a system is not inherently discriminatory. *Cf. Patterson v. American Tobacco Company,* 535 F.2d 257 (4th Cir. 1976); *Russell v. American Tobacco Company,* 528 F.2d 357 (4th Cir. 1975); *Local 189, United Papermakers and Paperworkers, AFL–CIO v. United States,* 416 F.2d 980 (5th Cir. 1969). Because she was hired when she first applied, she could not complain that she should have had a higher seniority position because of a failure to hire her in the

first instance. Furthermore, she received a promotion due to her seniority position.

Ms. Lane made no other complaint against either the Unions or the Company. She testified that she never had any problem with the Unions. She was never harassed by the Company, or by her supervisors, or by her co-employees. She has not shown anything that could form the basis of a deprivation of her constitutional rights to equal employment opportunity. Therefore, the Company and the Unions were entitled to a directed verdict with respect to the claims of Linda Lane.

### D. Donald Riggs

Donald Riggs began his career at South Central Bell as a part-time garageman in 1969.. He became a full-time lineman about 18 months later. He bid on the position of PBX-installer-repairman and got the job. To train him for the job, the Company sent him to school in New Orleans. While there, he failed the required proficiency test and upon returning was placed in the position of installer, on the same level that he had been prior to his successful bid. The school and test began Mr. Riggs' complaints.

Mr. Riggs testified that the reason that he did not complete the test in New Orleans successfully was a kidney infection he contracted the night before the exam. Upon notification to the Company of the problem, he received a second chance to take the test, this time in Shreveport. Again, he failed the test. Then he was sent back to a job on the same level that he had been before his promotion. He stated that not all whites were required to take the test. However, on cross examination, he could not identify any whites, to his personal knowledge, that did not have to take the test in order to maintain a promotion to a position that required special training. He introduced no records of any white employees that had been excepted from the testing requirements. He introduced no records of the Company to reflect that policy or to corroborate his testimony. This Court cannot find any policy that exempted whites but required blacks to pass a test in order to maintain a promotion that required additional training. With respect to the test in New Orleans and Shreveport, then, Mr. Riggs did not show any white employees who received better treatment or different treatment from that afforded him. Therefore, the testing incident cannot support his claim of employment discrimination due to race.

The second and only other area of complaint from Mr. Riggs concerned some entries on his personnel record that reflected some health problems. In particular, he objected to an entry made by one Mr. Shepherd that stated, or at least indicated, that he suffered from hypertension. He stated that he complained both to the Unions and to the Company that the entry was incorrect. At that point, his testimony broke down. On cross examination, he was asked if he had ever looked at his personnel entry since it was made. He responded that he had, the day that it was made. He was then asked whether he had looked since that time. He replied that he had not. Therefore, the Court could not determine whether or not the entry ever was changed. Thus, the Court could not conclude that the matter never was clarified. Both the Company and the Unions may have realized their alleged errors and revoked the entries, or they may have let them remain. In the absence of evidence the Court cannot pronounce any wrongdoing on the part of any defendant in connection with this incident.

Apart from the shortage of evidence, Mr. Riggs' credibility and memory were weak. Several times during cross-examination, defense counsel drew attention to discrepancies in his testimony. The two most glaring examples concerned the test in New Orleans and Mr. Riggs' health.

At trial, Mr. Riggs testified that he informed the Company through the test administrator, at test time in New Orleans, that he was ill. However, in his deposition he had stated that he had told no one at the Company that he was not feeling well. Such an important cog in a plaintiff's case, when that plaintiff is complaining that the Company unfairly tested him when he was

ill, cannot be satisfied by the plaintiff's contradictory testimony.

With respect to Mr. Riggs' blood pressure, his testimony was completely incongruous. He claimed at trial that he had never informed the Company of a blood pressure problem. On cross-examination, he denied ever having given the Company a written statement about his high blood pressure. Defense counsel then showed him a handwritten letter that stated that a doctor had told the author he had "high blood". Mr. Riggs then identified the handwriting as his own. Moreover, he testified that no doctor had ever told him about his high blood pressure. On cross-examination, defense counsel showed him an unsigned letter on the stationary of a Dr. Holoubek and asked him if the doctor had examined him, to which he replied yes. Then counsel went through the report, asking Mr. Riggs if the various items were included in the examination. Mr. Riggs agreed that all the items properly were included in the medical report *except* high blood pressure. Ordinary reason dictates that Mr. Riggs' memory, at the least, failed him with respect to his health examination.

With such glaring inconsistencies in his testimony, Mr. Riggs could not bear his burden of proof on his allegations without substantial corroboration; he offered none at all. Even accepting them as true to a great extent, he showed no unfair treatment by the Company or the Unions. In fact, he had no proof that the personnel entries were not erased. Moreover, he was asked if he knew of any white employee who had received better treatment; he could not name a single one, and the testimony did not reveal any. Donald Riggs did not prove that he was subjected to any adverse treatment because of his race. The Court had no choice but to grant defendants' motions for directed verdicts.

### E. A. C. Whitaker

Mr. Whitaker's complaints revolved around four particular incidents. He alleged that the Company refused to hire him when he first applied, that he suffered harassment at the hands of Company employees, that he was wrongfully discharged because of an omission on his employment application and that he was wrongfully suspended for sleeping in his truck. The complaint about the refusal to hire was unsupported by any Company personnel records and was not corroborated by any other witnesses. Moreover, Mr. Whitaker presented no evidence that any whites were hired at the same time he applied. Therefore, the alleged refusal to hire could not support his claim. With respect to harassment, the only specific incident that he mentioned concerned some remarks made to him by a co-employee about filling out his time card with red ink instead of pencil. He was unable to connect the incident to any Company policy; furthermore, the person making the remark was a co-worker, not a supervisor. No evidence tended to show that the untoward conduct occurred because of his race. The charge of harassment, then, could not support his case. The other two incidents raised more substantial questions regarding employment discrimination.

Upon learning that Mr. Whitaker had omitted to mention an arrest that was required to be listed on the employment application, the Company dismissed him. He complained to the Unions, which took his complaint through three levels of grievance procedures. The procedure resulted in his reinstatement, although he did not get back pay. At that point in time, the Unions offered to take his grievance to arbitration, but they told him that the procedure might take several months and that he could not work while the case was pending. He then made the decision to accept the settlement without arbitration in order to return to work. He told the Court that he did so because he had a number of bills that had built up during the time he was out of work. During the course of the testimony, Mr. Whitaker did not show a single white employee who was given a better alternative or better representation at the hands of the Unions; he did not show a single white employee who omitted an arrest on an employment application and was not dis-

missed. Furthermore, he did not show any Company or Union policy that would lead to differential treatment between white and black employees under similar circumstances. Thus, the false application entry could not support a claim of employment discrimination due to race.

On another occasion, the Company suspended Mr. Whitaker for allegedly sleeping in his truck on the job. Once again, the Union took up his cause. The suspension of three days was reduced to one day, but the Union refused to take the case to arbitration, telling Mr. Whitaker that the arbitration procedure would be too expensive in comparison to the relief that might have been granted. Mr. Whitaker introduced no evidence from which the Court could infer that his treatment by the Company or the Unions was racially motivated. He could not show that white employees were treated any differently; that is, he could not show that white employees alleged to have been sleeping on the job would not have been suspended or that the claims of white employees whose suspensions were reduced from three days to one day would have gone to arbitration.

In conclusion, with respect to Mr. Whitaker, there was no evidence as to any racial motivation in the Company's failure to hire him upon his original application. The evidence showed able representation of Mr. Whitaker by the Unions at all stages; indeed, the record reflected successful advocacy in nearly every situation. A. C. Whitaker did not demonstrate that any adverse treatment was leveled at him due to his race. Therefore, the defendants' motions for directed verdicts had to be granted.

### F. Billy Ray Jordan

Mr. Jordan complained that he was wrongfully dismissed due to his race under the guise of a Company policy regarding suspension of employees arrested on drug charges. Mr. Jordan was arrested on a charge of possession of marijuana with intent to distribute, and he was later convicted of simple possession of marijuana, after entering a guilty plea to the lesser offense. He complained to the Unions, which initiated grievance procedures. The procedures resulted in several meetings but Mr. Jordan did not know how many there were or their result. There were numerous problems of communication, caused by his change of address during the course of the grievance procedures. Mr. Jordan claimed that he never received any notice that his grievance had been concluded. The Unions could not take the grievance to arbitration because, under the collective bargaining agreement, a Union member had to acquire six months' experience with the Company before being entitled to arbitration. During the course of his testimony and the testimony of all other witnesses, it was not shown that any white employee arrested on a similar charge was not or would not have been discharged, or that a similarly situated white employee would have been better represented by the Unions.

Mr. Jordan's testimony on some points simply *was not credible.* For example, the only dates to which he could testify with certainty were the date of his application and hiring and the date of his change of address. When questioned about the date he filed EEOC charges, which are critical to this Court's jurisdiction, he could only recall at trial that he had filed between August, 1974 and "the first of '75". In his complaint in intervention, he affirmatively stated that he had filed his charge in August, 1974. On cross-examination, defense counsel brought out that at his deposition, he could not pinpoint the date any closer than sometime between 1973 and February, 1976.

Mr. Jordan's testimony cannot bear his burden of proof standing alone. His memory was so weak, or so convenient, that his statements are hardly worthy of belief, and are worthy of very little weight. Even taken as true, which this Court cannot do because of his lack of credibility, he could show no different treatment at the hands of the Unions or the Company than that afforded any white employee. Therefore, he has failed to prove a *prima facie* case of

**710**

employment discrimination due to race, and the defendants' motions for directed verdicts were meritorious.

## III.  CONCLUSIONS

■ Due process of law requires stringent representation of absent parties prior to certification of a claim as a class action. For the reasons assigned earlier, the potential class representatives failed to achieve the obligatory standard of the Fifth Amendment to the United States Constitution.

All the plaintiffs and intervenors presented a similar pattern of evidence. The pattern consisted of testimony that the plaintiff or intervenor is black and received some treatment that was adverse. To be successful in presenting a *prima facie* case of racial discrimination, one further step is necessary. The plaintiff must prove that a person of a different race was or would have been treated more favorably. Thus, a *prima facie* case of employment discrimination due to race or color, brought by a black person, consists of a showing of racial identity, followed by evidence of adverse treatment by the defendant, followed by evidence that white employees did receive or would have received better treatment under the same or similar circumstances. Since none of the plaintiffs bridged the gap of the final element of proof, their cases failed, and the Court ordered that directed verdicts be entered against them.

The record shall remain open for the formal entry of judgment in this cause.