**Lonnie RANDOLPH, Plaintiff,**

v.

**UNITED STATES ELEVATOR CORPORATION, Defendant.**

**No. 76–1316–CIV–WMH.**

United States District Court,
S. D. Florida,

April 14, 1978.

---

Harold Bronstein, Miami, Fla., for plaintiff.

Sheldon R. Rosenthal, Miami, Fla., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

HOEVELER, District Judge.

This cause was before the Court for a non-jury trial on the Plaintiff's (Randolph) allegations that he was discharged from his employment with the Defendant, United States Elevator Corporation (U.S. Elevator) due to his race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. 1981. Randolph has further alleged his discharge was wrongful and a breach of the collective bargaining agree-ment entered into by U.S. Elevator and Randolph's authorized bargaining agent, International Union of Elevator Constructors, Local 71 (Local 71).

### I. FINDINGS OF FACT

1. Randolph is a Black male citizen of the United States, born March 23, 1952, residing in Miami, Dade County, Florida, and who has permanently lived within Local 71's jurisdictional territory since his birth.

2. U.S. Elevator is a foreign corporation doing business in Florida, constructing, installing and servicing elevators. At all times material hereto, U.S. Elevator was a wholly-owned subsidiary of the Cubic Corporation and an employer in an industry affecting commerce as defined in the Labor Management Relations Act, 29 U.S.C. 142(1), (3), and 152(2), and within the meaning of Section 301 of the Labor Management Relations Act, 29 U.S.C. 185.

3. At all times material hereto, U.S. Elevator was a person and employer in an industry affecting commerce as defined in Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e(a), (b), (g) and (h).

4. Local 71 is an unincorporated labor organization with its principal place of business in Miami, Dade County, Florida. At all times material hereto, Local 71 was a labor organization representing employees in an industry affecting commerce as defined in 29 U.S.C. 142(1), (3), and 152(5), and Randolph's authorized collective bargaining representative.

5. At all times material hereto, U.S. Elevator and Local 71, were signatories to the collective bargaining agreement effective March 24, 1972, to July 8, 1977. This collective bargaining agreement was entered into by U.S. Elevator and Local 71, for the benefit of the employees in said bargaining unit and Randolph is entitled to the benefits of said agreement and to enforce the provisions thereof.

6. Randolph began working in the elevator industry in November of 1972. Randolph worked for Montgomery Elevator

Company and Verti-Trans Elevator Company prior to being referred to work at U.S. Elevator by Local 71. Randolph was first employed by U.S. Elevator as an elevator constructor's helper on July 20, 1973, and worked there continuously until his termination on December 3, 1974.

7. At the time Randolph was hired on July 20, 1973, U.S. Elevator employed twenty-two elevator constructor mechanics and helpers, all of whom were White. Of these twenty-two White employees, eight were elevator constructor mechanic's helpers.[1]

8. During the time of Randolph's employment, U.S. Elevator hired thirty-one elevator constructor's helpers, "70%", of which twenty-seven were White, three were Black, and one had a Spanish American surname. Of these thirty-one individuals, the Spanish American surnamed individual was terminated prior to Randolph as were two of the Blacks. Nine employees, eight of whom were White, were kept on the job after Randolph was discharged though they had been hired after Randolph.[2]

9. After the termination of Randolph, U.S. Elevator retained in its employ, thirty-three elevator constructor mechanics and helpers, "70%". Fifteen of these individuals were elevator constructor mechanic's helpers "70%", fourteen of whom were White. Of these fourteen White elevator constructor mechanic's helpers "70%", eight of these retained White individuals had been hired after Randolph.[3]

10. Randolph was well-qualified to perform his work as an elevator constructor mechanic's helper "70%", and at all times, including the time of his discharge, was satisfactorily performing his job function as an elevator constructor mechanic's helper "70%". On December 3, 1974, Randolph was working at Lime Bay Condominiums in Tamarac, Florida, helping Thomas Whitler adjust elevators and had been working with Whitler for three months prior to his termination.

11. During his employment with U.S. Elevator, Randolph worked as a temporary mechanic pursuant to Article X, paragraph 4, of the collective bargaining agreement, from December 3, 1973, until May 13, 1974, except for the one week period December 10, 1973 to December 20, 1973.

12. A White replacement employee, Vernon Bowen, took Randolph's place at Lime Bay Condominiums on December 3, 1974 and continued to work as Whitler's assistant or teammate for six months thereafter.

13. Bowen was 40 years old when he was first employed by U.S. Elevator on July 23, 1973, and prior to his employment at U.S. Elevator, Bowen had never worked in the elevator industry. Bowen was retained in employment until January 14, 1976. Bowen's wife was employed as office help

---

1.

| NAME | RACE | DATE HIRED | DATE EMPLOYMENT CEASED |
|------|------|-----------|------------------------|
| Rodney Case | C | 04/16/73 | 04/22/76 |
| Grady Davis | C | 07/02/73 | 02/16/76 |
| Edgar Scoggin | C | 05/24/73 | 04/21/76 |
| John Scharrer | C | 05/05/73 | 11/18/74 |
| Robert Zuehlsdorf | C | 05/01/73 | 10/16/74 |
| Robert Vachon | C | 06/12/73 | 02/20/76 |
| Frank Farrugello | C | 10/04/72 | 11/11/74 |

Further, Mr. Levine testified that Mr. Zuehlsdorf was fired as opposed to being laid-off for lack of work. Mr. Levine also indicated that there was an additional Caucasian individual, Tom Brown, who was hired on July 2, 1973, and whose employment ceased on November 30, 1973.

2.

| NAME | RACE | DATE HIRED | DATE EMPLOYMENT CEASED |
|------|------|-----------|------------------------|
| Charles Barranco | C | 02/06/74 | 01/20/75 |
| Vernon Bowen | C | 07/23/73 | 01/14/76 |
| Lee Brownstein | C | 07/19/74 | 04/07/75 |
| David McCarty | C | 02/18/74 | 01/20/75 |
| Brian McGann | C | 02/11/74 | 04/15/75 |
| Michael Mikula | C | 03/20/74 | 04/07/75 |
| Ira Yellin | C | 03/25/74 | 04/21/76 |
| Wallace Kelly | C | 09/19/73 | 05/23/75 |
| Jerry Washington | B | 02/04/74 | 04/30/75 |

In addition, two other Caucasian individuals were hired after Lonnie Randolph and were terminated from employment within several days after Randolph as follows:

| NAME | RACE | DATE HIRED | DATE EMPLOYMENT CEASED |
|------|------|-----------|------------------------|
| Warren Crouse | C | 10/18/74 | 12/05/74 |
| Frederick McGill | C | 03/20/74 | 12/04/74 |

3. Please see Footnotes 1 and 2, supra.

by U.S. Elevator from September of 1973 until January 14, 1976 when she was terminated.

14. Bowen during his employment with U.S. Elevator, unlike Randolph never probated as a mechanic pursuant to Article X, paragraph 4, of the collective bargaining agreement. Moreover, and also unlike Randolph, Bowen had his hourly wage increased from a probationary helper's wage to a 70% helper's wage prior to his minimum qualification period provided for in Article V, paragraph 1C of the collective bargaining agreement which qualification period Randolph was required to fulfill. Bowen was not eligible for a wage increase until January 30, 1974, at the earliest, but received this wage increase as of November 30, 1973.

15. U.S. Elevator hired a White employee, Wallace M. Kelly on or about March 3, 1970, to work as a carpenter at its home office, 2500 Sweetwater Springs Boulevard, Spring Valley, San Diego County, California. Kelly worked there as a carpenter and performed no elevator constructor work within the purview of the collective bargaining agreement.

16. On August 10, 1973, Kelly was hired by U.S. Elevator to work in their warehouse in Fort Lauderdale, Florida as a warehouseman. This work was not within the purview of the collective bargaining agreement.

17. Kelly was not, within the meaning of the collective bargaining agreement, a "transient employee".

18. Effective September 21, 1973, two days after Kelly began work in the elevator industry, his hourly rate was increased from a 50% helper's wage to a 70% helper's wage. As Kelly did not begin in the industry until September 19, 1973, he was not eligible to be paid such hourly rate pursuant to Article V, paragraph 1C, and Article X, paragraph 3, until, at the very earliest, March 20, 1974. Further, on November 28, 1973, Kelly's hourly wage was further increased to that of a mechanic's wage even though he was not eligible for such hourly wage pursuant to the collective bargaining agreement and U.S. Elevator had not obtained a temporary mechanic's permit from Local 71 in accordance with Article X, paragraph 4 of the collective bargaining agreement.

19. Kelly was retained in the employ of U.S. Elevator when Randolph was laid off.

20. At the time of Randolph's discharge, Roger Levine was employed by U.S. Elevator as the construction superintendent. The decision to terminate Randolph on December 3, 1974, was made solely by Levine, without any input from any other supervisor and/or person in the employ of U.S. Elevator.

21. On December 3, 1974, U.S. Elevator had a policy and procedure manual in effect, part of which was numbered C 2–1 which applied to the lay-off of individuals employed by U.S. Elevator. This policy and procedure manual makes reference to an affirmative action program and states that U.S. Elevator will give careful consideration to five factors: 1) ability, 2) experience, 3) training, 4) character, and 5) U.S. Elevator will not discriminate against any employee due to his race.

22. In terminating Randolph on December 3, 1974, Levine testified that he did not consult nor use the policy and procedure manual. He was, however, familiar with its contents.

23. The standards used by Levine in terminating Randolph were vague, elusive, and subjective, and there were no safeguards in the procedure Levine used to avert discriminatory practices.

## II. *CONCLUSIONS OF LAW*

This cause is before the Court on Randolph's allegations of racial discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.,* and the Civil Rights Act of 1866, 42 U.S.C. 1981. Randolph has further alleged that his discharge by U.S. Elevator was wrongful and a violation of the collective bargaining agreement entered into by U.S. Elevator and Local 71.

The Court has jurisdiction over the parties and the subject matter of this action

pursuant to 42 U.S.C. 2000e–5(f)(3), 28 U.S.C. 1337, 1343(3), and 29 U.S.C. 185.

Randolph alleges racial discrimination in that he was terminated from his employment by U.S. Elevator on December 3, 1974, because he was Black. Randolph must show that his discharge was caused because of dissimilar treatment caused in part by his race. As in any Title VII action, Randolph must carry the initial burden of establishing the prima facie case and then if he does so, U.S. Elevator must show by a preponderance of the evidence that they have articulated a legitimate, non-discriminatory reason for Randolph's dismissal. Upon proper proof of a legitimate reason for U.S. Elevator's decision, Randolph would then bear the burden of proving by a preponderance of the evidence that U.S. Elevator's reasons were just a pretext for racial discrimination. *McDonnell Douglas Corp v. Green,* 411 U.S. 792, 800–807, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Turner v. Texas Instruments, Inc.,* 555 F.2d 1251 (5th Cir. 1977); *Flowers v. Crouch-Walker Corporation,* 552 F.2d 1277 (7th Cir. 1977); *East v. Romine, Inc.,* 518 F.2d 332 (5th Cir. 1975).

■ There is ample evidence in the record to support the Court's conclusion that Randolph established a prima facie case. Once Randolph establishes a prima facie case of racial discrimination, it signifies that he has produced sufficient evidence to be entitled to judgment if U.S. Elevator fails to meet their burden in response. *McDonnell Douglas Corp. v. Green,* supra; *East v. Romine, Inc.,* supra; *Stewart v. General Motors Corp.,* 542 F.2d 445, 450 (7th Cir. 1976). Randolph's prima facie case is in no way diminished by the fact that there was one Black employee, "70%" helper, who remained in the employ of U.S. Elevator after Randolph's termination. Nor is the prima facie case and the inference of racial discrimination in any way diminished by Randolph's work history with U.S. Elevator. The reduction of Black employees in favor of White employees is no less unlawful than the elimination of all Black employees from a work force. *Wallace v. Debron Corp.,* 494

F.2d 674 (8th Cir. 1974); *Flowers v. Crouch-Walker Corporation,* supra, at 1282. U.S. Elevator is liable as principal for any violation of Title VII or 42 U.S.C. 1981 by Levine in his authorized capacity as supervisor. *Ostapowicz v. Johnson Bronze Co.,* 369 F.Supp. 522 (W.D.Pa.1973), modified, 541 F.2d 394 (3rd Cir. 1976); *Tidwell v. American Oil Company,* 332 F.Supp. 424 (D.Utah 1971).

U.S. Elevator does not challenge the capabilities or the workmanship of Randolph. They insist the lay-off was due to an economic slow-down at that period of time, that they did not intend to discriminate against Randolph, that the statistics have no meaning to this Court, and that Levine decided in his own mind whom to lay-off on December 3, 1974.

■ U.S. Elevator's contention that they never intended to discriminate in its employment policies and practices is irrelevant in determining liability under Title VII and 1981. The law is clear that a Plaintiff in a job discrimination case need not prove that the employer has a specific intent to discriminate. It is sufficient that the employer's conduct produced discriminatory results. *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In *Rowe v. General Motors Corporation,* 457 F.2d 348, 355 (5th Cir. 1972), the Court stated:

It is clearly not enough under Title VII that the procedures utilized by employers are fair in form. These procedures must in fact be fair in operation. Likewise, the intent of employers to utilize such discriminatory procedures is not controlling since "Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation." *Griggs v. Duke Power Company,* supra, 401 U.S. at 432, 91 S.Ct. 848. It is therefore clear that employment practices which operate to discriminate against people because of their race, color, religion, sex or national origin, violate Title VII, even though the practices are fair on their face and even though the employer had no subjective intention to

discriminate.[14]  (Emphasis in the original, footnote omitted).

■ U.S. Elevator's contention that statistics have no probative value in this case is also wrong as a matter of law.  While statistics are not determinative in an individual action alleging racial discrimination, as they are in a class action, statistical evidence does have probative value in an individual discrimination case for the purpose of showing motive, intent, and purpose.  *Terrell v. Feldstein Company,* 468 F.2d 910 (5th Cir. 1972); *Marquez v. Omaha District Sales Office, Ford Division of Ford Motor Company,* 440 F.2d 1157 (8th Cir. 1971).  See also *State of Alabama v. United States,* 304 F.2d 583, 587 (5th Cir. 1962), aff'd per curiam, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962); *Brooks v. Beto,* 366 F.2d 1, 9 (5th Cir. 1966), cert. den., 1967, 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135.

■ In the instant case, the statistics show that at the time Randolph was hired, there were no Black "70%" elevator constructor mechanic's helpers employed by U.S. Elevator.  The statistics further show that during the time of Randolph's employment, thirty-one elevator constructor mechanic's helpers "70%" were hired and of these twenty-seven were White, three were Black and one had a Spanish American surname.  Two of the three Black individuals and the Spanish American surnamed individual were terminated prior to Randolph.  At the time Randolph was terminated on December 3, 1974, there were fifteen elevator constructor mechanic's helpers "70%" employed by U.S. Elevator and all but one of these individuals were White.  More critically, the overall reduction in its work force between July 1974 and December 3, 1974 showed a diminution of the total work force from 54 to 33 employees.  Four Blacks were employed during that period and all but one were terminated representing a reduction of 75% of the Black employees.  At the same time, the White labor force diminished only 34%.  No Black is presently employed by U.S. Elevator even though at least eleven have been employed at various times.  Moreover, the last Black employed by U.S. Elevator was laid off in April, 1975.

U.S. Elevator urges that there was a proper business reason for the lay-off of Randolph on December 3, 1974, in that there was a general economic decline in the construction industry.  The Court acknowledges that there was an economic decline in the construction industry and that U.S. Elevator had to reduce its work force.  The Court is not convinced though, that this in and of itself, is a satisfactory "business purpose" as a matter of law to rebut Randolph's prima facie case.  *Griggs v. Duke Power Company,* supra, *Robinson v. Lorillard Corp.,* 4 Cir., 444 F.2d 791, 799; *Flowers v. Crouch-Walker Corporation,* supra.  It is the selection of Randolph for lay-off on December 3, 1974, and the process by which he was selected as compared to all other "70%" elevator constructor mechanic's helpers who were employed by U.S. Elevator on that date, which is the issue before the Court.

The decision to lay off Randolph on December 3, 1974, was made solely by a White supervisor, the construction superintendent, Roger Levine.  Levine's decision was based on a totally subjective evaluation in his mind without any reference to objective criteria, minimal observation of Randolph's performance, and a total absence of discussions between Levine and the individuals who supervised Randolph, concerning Randolph's qualifications and work performance.  Nor was there any evidence introduced by the defendant of a comparative nature which would show the qualifications of Randolph with respect to all other elevator constructor mechanic's helpers, "70%" who remained employed by U.S. Elevator after Randolph was laid-off.  It is well settled that employment decisions made in this manner are in violation of Title VII and 1981.  *Rowe v. General Motors Corp.,* 457 F.2d 348 (5th Cir. 1972); *Baxter v. Savannah Sugar Refining Corp.,* 495 F.2d 437 (5th Cir. 1974), sub nom. *Savannah Sugar Refining Corp. v. Baxter,* cert. den. 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308; *Pettway v. American Cast Iron Pipe Company,* 494

F.2d 211 (5th Cir. 1974); *East v. Romine, Inc.,* supra.

In *Rowe,* supra, the Fifth Circuit Court of Appeal found that the Defendant's employment practices with respect to promotion and transfers were in violation of Title VII as the foreman's recommendation was the indispensable single most important factor in the process. The Court further noted that the foreman was given no written instructions pertaining to the qualifications necessary, and the standards controlling the decision were vague and subjective, and that there were no safeguards in the procedure designed to avert discriminatory practices. The Court in evaluating the testimony offered by the Defendant stated:

> Blacks may very well have been hindered in obtaining recommendations from their foremen since there is no familial or social association between these two groups.[23] All we do today is recognize that promotion/transfer procedures which depend almost entirely upon the subjective evaluation and favorable recommendation of the immediate foreman are a ready mechanism for discrimination against Blacks much of which can be covertly concealed and, for that matter, not really known to management. We and others have expressed a skepticism that Black persons dependent directly on decisive recommendations from Whites can expect non-discriminatory action. See, *Hawkins v. North Carolina Dental Society,* 4th Cir., 1966, 355 F.2d 718, 723–24; *Cypress v. Newport News General Nonsectarian Hosp. Assoc.,* 4th Cir., 1967, 375 F.2d 648, 655; *Meredith v. Fair,* 5th Cir., 1962, 298 F.2d 696, 702, cert. den., 1962, 371 U.S. 828, 83 S.Ct. 49, 9 L.Ed.2d 66. [Footnote omitted.] (*Rowe,* 457 F.2d at 359).

■ In *East v. Romine, Inc.,* supra, the Court indicated that "comparative evidence lies at the heart of a rebuttal of a prima facie case of employment discrimination." There was no comparative evidence introduced with respect to all other 70% helpers who remained employed by U.S. Elevator after December 3, 1974. The Court did hear some testimony concerning Bowen and Kelly and that their prior work experience outside of the elevator construction industry made these two individuals more qualified than Randolph. Where the employer claims that prior experience in another industry is critical in the decision to select one employee over another in a different industry, the employer has the burden of proving that such prior experience is a *necessary* qualification for the job in question as opposed to a pretext for engaging in unlawful discrimination. *U. S. v. Jacksonville Terminal Company,* 451 F.2d 418 (5th Cir. 1971).

The Court does conclude that with respect to the payment of wages there was disparate treatment shown Randolph as both Kelly and Bowen were paid at wage rates and under conditions which were in violation of the collective bargaining agreement. Both Kelly and Bowen were paid wages at the rate of a "70%" helper prior to the time they were eligible to receive such wage rate in violation of Article V, paragraph 1C, and Article X, paragraph 3 of the collective bargaining agreement. In addition, Kelly was paid mechanics wages in violation of Article X, paragraph 3 and 4. Though there was testimony that the collective bargaining agreement only sets a minimum wage and that U.S. Elevator could pay an individual whatever he desires, the Court finds this in complete variance with Article XXVI, paragraph 1 of the collective bargaining agreement. The payment of wages to these individuals was clearly disparate treatment which is the cornerstone of any proof of discrimination pursuant to 42 U.S.C. 1981 and Title VII and is evidence of discrimination. *Clark v. South Central Bell Tel. Co.,* 419 F.Supp. 697 (D.C.La.1976); *Carter v. Gallagher,* 452 F.2d 315 (8th Cir. 1971), cert. den. 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338; *Long v. Ford Motor Company,* 496 F.2d 500 (6th Cir. 1974).

■ Randolph's second cause of action alleges breach of the collective bargaining agreement in that Article XXII, paragraph 2 was violated at the time of Randolph's lay off. Randolph claims that Kelly is a transient employee within the meaning and intent of the collective bargaining agreement

and that he should have been laid off prior to Randolph. The Court finds no substance to this contention.

To summarize, the defendant's position that the failing economy dictated its decision to terminate Randolph, while valid to a point, does not justify discriminatory employment practices. Since the Court has determined that Randolph established a prima facie case, the employer then bears the risk of non-persuasion. By failing to show that U.S. Elevator had in existence legitimate objective non-discriminatory standards which were in fact utilized in the selection of the employees to be terminated on account of the economic slow down, the defendant has failed to carry its burden. The evidence, in fact, revealed the delegation of the responsibility to one person in management status who applied a subjective approach in making termination decisions. The sincerity of such witness is not the important point. A proper, objective and fair method of appraisal, to prevent errant subjectivity, is the point. No evidence of any objective safeguards against discriminatory practices was presented by U.S. Elevator. Coupled with the existence of competent evidence showing disparate treatment of Blacks in connection with wages, promotions and terminations, the Court finds that the release of Randolph on December 3, 1974 was in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981.

Judgment shall be entered for the plaintiff and the Court pursuant to its order of July 11, 1977, shall hold a hearing on the 27th day of April, 1978 at 2:00 p. m., to consider the appropriate relief that plaintiff is entitled to, including attorney's fees and costs.