**Elbert G. GREEN, Individually and Robert Danley, Individually and as the Representative of Persons Similarly Situated**

v.

**UNITED STATES STEEL CORPORATION.**

Civ. A. No. 76–3673.

United States District Court, E.D. Pennsylvania.

July 18, 1983.

Richard Z. Freemann, Jr., Creed C. Black, Jr., John P. Pucci, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for plaintiffs.

Henry Reath, Thomas Preston, George Price, Philadelphia, Pa., for defendant.

## MEMORANDUM

NEWCOMER, District Judge.

This employment discrimination class action was tried to the Court in December, 1982. The following shall constitute my Findings of Fact and Conclusions of Law.

*Findings of Fact*

1. This is a Title VII and § 1981 class action brought on behalf of all black persons who unsuccessfully sought employment at the Fairless Hills, Pennsylvania plant of United States Steel Corporation ("USS") between July 11, 1972 and the present. The class described above was certified by Order dated August 26, 1980.

2. The defendant, USS, is a corporation doing business in the Commonwealth of Pennsylvania, in many other states, and in foreign countries. Throughout the class period, USS owned and operated steel manufacturing and other facilities located in Fairless Hills, Pennsylvania and employed from 7,000 to 10,000 persons there. USS is an "employer" within the meaning of Title VII. (Unless otherwise specified, references hereinafter to USS shall be understood to refer specifically to the Fairless Hills facilities of USS.)

3. Named plaintiff Elbert Green is a black male who unsuccessfully sought employment as a laborer in USS's Production & Maintenance department ("P & M") by application dated April 11, 1973. On May 7, 1973, Green filed with the Equal Employment Opportunity Commission ("EEOC") a timely charge of race discrimination in employment against USS, and subsequently he received a notice of his right to sue in federal court.

4. Green was an unnamed member of the plaintiff class of unsuccessful black job applicants at USS in *Dickerson v. United States Steel Corp.*, C.A. No. 73–1292, a Title VII and § 1981 race discrimination suit.

5. On November 29, 1976, following the severance of the applicant class from the *Dickerson* lawsuit, Green filed this action on his own behalf and on behalf of the applicant class.

6. Named plaintiff Robert Danley is a black male who unsuccessfully sought a P & M job by application dated June 4, 1976.

7. Danley was also initially an unnamed class member in *Dickerson*. Following his receipt of notice of the severance of the applicant class from that action, Danley filed with the EEOC a timely charge of race discrimination in employment against USS and received a notice of his right to sue in federal court.

8. When Green filed this action on behalf of the applicant class, Danley became an unnamed class member. On January 10, 1979, Danley filed a motion to intervene as a named plaintiff. Prior to a ruling by the Court, the parties stipulated that Danley could serve as Green's co-representative of the applicant class.

9. By a Memorandum and Order dated August 29, 1979, I entered partial summary judgment in favor of USS on Green's individual claim. Discovery had established that Green had falsified his employment history on his job application. I held that this evidence satisfied USS's burden of articulating a legitimate, nondiscriminatory reason for its failure to hire Green. I reserved for trial the questions whether plaintiff was qualified for the job for which he applied; whether USS was hiring anyone for those jobs at the time he applied; whether it was hiring for those jobs immediately after his rejection; and whether, if plaintiff could establish a prima facie case, plaintiff could establish that USS's articulated reason for rejecting him was a standard applied equally to all races or was, rather, a mere pretext for racial discrimination.

10. In my August 26, 1980 class certification order, I ruled that Green could not serve as a class representative because his claim, presenting the narrow and atypical issue whether USS had uniformly and nondiscriminatorily rejected applicants who falsified their job applications, was not appropriate for class treatment. Danley thus became the sole class representative, and Green remained a named plaintiff on his individual claim only.

11. At trial, plaintiffs presented no evidence relevant to Green's individual claim.

12. On the first day of trial, plaintiffs narrowed their case to include only those blacks who unsuccessfully sought employment in P & M jobs during the class period. Plaintiffs also indicated that they were not pressing their case as to the years 1975, 1980, and 1981, when very little hiring was done for P & M jobs at Fairless Hills, or as to the years 1976 and 1977, when plaintiff's evidence showed that a moderate amount of hiring was done but that blacks were hired at levels close to or exceeding their representation in the applicant pool. Plaintiff's case therefore focussed on the question whether USS unlawfully discriminated against black P & M applicants at Fairless Hills in the years 1972–74, 1978, and 1979.

13. Plaintiff Danley did not testify at trial, and plaintiffs presented no proof directly relating to him as an individual, other than his application for employment and a stipulation relating to his satisfaction of the jurisdictional prerequisites. His application date of June, 1976 places him among those class members who applied to USS at a time when plaintiff's statistical evidence shows that USS was hiring blacks at rates equalling or exceeding their representation in the applicant pool.

14. Plaintiffs presented the testimony of two unnamed class members, Christine Davidson and Frederick Wright. Ms. Davidson, a black woman, submitted an application for a P & M job on August 24, 1976. She had a GED degree, vocational training, and a record of steady employment. Mr. Wright, a black man, submitted an application for a P & M job on June 8, 1977. He had several years of college education, prior work experience as a laborer, and a record of steady employment before, during, and after college. Although both Ms. Davidson and Mr. Wright possessed the qualifications necessary to be considered for employment in an entry-level P & M job, neither was hired by USS. Thereafter, USS continued to hire persons for entry-level P & M jobs.

15. The P & M job category is the largest at USS. Approximately 95% of new hires (that is, people hired from outside the company rather than promoted or transferred from within) in P & M during the class period were hired for the position of laborer, an entry-level unskilled job. About 4% of new hires were for skilled jobs in the trade and craft category, although USS usually filled these positions through its internal apprenticeship programs. P & M jobs other than those in the laborer or trade and craft categories were customarily filled from within the plant, by a posting and bidding system, although in rare instances individuals were hired from outside to fill such jobs.

16. Approximately 15% of new P & M hires during the class period were hired for summer jobs. Virtually all of these jobs were in the laborer category.

17. USS's minimum hiring criteria for all P & M positions remained constant throughout the class period. Anyone hired had to be at least 18 years old, pass a physical examination, and be able to read safety signs (a requirement so minimal that defendant's witnesses could recall no one ever having failed to meet it). Additional minimum requirements applied to those seeking skilled trade and craft jobs. However, as long as an applicant met the three minimum requirements described above, there was no single quality or trait which would make an applicant ineligible *per se* for a laborer job. *Cf.* P–55 [1] (USS policy restricting employment of relatives within a single supervisory unit); P–56 (USS policy stating that USS would "usually" not consider applicants who had been convicted of arson, malicious destruction of property, or acts of sexual perversion); P–57 (USS policy stating that alien applicants should be required to produce appropriate documentation).

---

1. Many of the documents which will be referred to by "P" exhibit numbers were also defense exhibits.

18. In its newspaper advertisements for laborers, USS stated that there was "no experience necessary," and that USS required only "common sense and a desire to work" (P–114). In fact, many of those hired into P & M laborer jobs during the class period had no prior work experience. USS expected new hires for P & M jobs other than those in the trade and craft category to learn any skills necessary to perform their jobs, or other jobs they might be promoted into, through on-the-job training or classroom instruction provided by USS.

19. Throughout the class period, USS's official policies relative to hiring new employees were set forth in the following documents: Exhibits P–43, P–53, P–54, P–55, P–56, P–57, P–58, P–59, and P–64. Exhibit P–43, entitled Procedure for Uniform Employment Practices, set forth USS's official policy of nondiscriminatory hiring of the best qualified candidates.

20. USS did not conduct any training sessions to indoctrinate the many individuals responsible for implementing its hiring policies as to their meaning and application.

21. During the class period, USS received written employment applications on a variety of different forms, all of which requested the applicant to list basic background information concerning schooling, prior employment, military record, age, physical condition, and whether the applicant had any relatives in USS's current or past work force. Such applications were received by mail or hand-delivery, or might be filled out in USS's personnel office by individuals who stopped by to inquire about employment. USS accepted new applications from persons who had previously applied but had not been hired.

22. Upon receiving a job application, USS's practice was to record it in a business record called the Job Applicant Log ("JAL"). The following information was entered in the JAL from each application: date of application; name of applicant; EEOC code (indicating race and sex); job applied for; and comments.

23. Separate JALs were prepared for summer applicants for 1972, 1973, and 1974, the only years during the class period in which USS made summer hires.

24. Larry Edwards, who was USS's Supervisor of Employment until 1975 and General Supervisor of Personnel thereafter, and Mabel Williams, who became Supervisor of Employment when Edwards was promoted in 1975, both instructed personnel office employees repeatedly to maintain the JALs as promptly and accurately as possible.

25. On occasion, a backlog of one or more weeks developed in the entry of application information into the JAL. All such information was, however, ultimately entered into the JALs. Any errors in, or omissions from, the JALs were due merely to normal clerical mistakes. From their personal experience with the JALs, Mr. Edwards and Mrs. Williams believed that no errors or omissions in the JALs occurred in a racially disproportionate manner. That is, they understood that blacks were included in the JALs with the same frequency as non-blacks.

26. In interrogatory answers, USS stated under oath that information concerning applicant flow should be obtained from the JALs (USS's Response to Interrogatory 4 of Plaintiffs' Third Set of Interrogatories). At trial, Mr. Edwards testified that all existing information on applicant flow at USS during the class period is in the JALs. During the class period USS used applicant flow data from the JALs to defend against 43 EEOC charges of race discrimination in hiring. USS also used applicant flow data derived from its JALs to prepare its Affirmative Action Quarterly Reports (AAQRS), which it filed with the United States government pursuant to certain consent decrees entered into in the course of prior litigation.

27. Mr. Edwards and Mrs. Williams reviewed newly submitted applications from time to time and would occasionally single one out for special consideration. One reason why an application might receive special consideration would be that the appli-

cant had a relative employed at USS. Such applications were moved ahead of other applications and placed immediately in the "ready" file—that is, the file of processed applications which had been cleared as worthy of consideration and which were ripe for the scheduling of an interview.

28. The "comments" section of the JALs contain occasional entries indicating that Edwards had given the applicant special consideration.

29. Those applications which were not placed immediately into the "ready" file were placed into general application files which were segregated according to the EEOC category and job preference of the applicant. An inexact system of prioritizing was employed with respect to applicants who fell into more than one category. For instance, a black male veteran's application might be filed in the "black males" category or the "veterans" category or might be duplicated and filed in both. USS also often duplicated and cross-filed applications of individuals who applied for more than one type of job, for example, Production & Maintenance or Clerical & Technical.

30. Prior to about 1977, USS followed a general policy of considering for employment persons whose applications had been submitted to USS within the previous twelve months. Therefore, the general application files were reviewed periodically to remove those applications which were more than a year old. In about 1977, USS adopted a policy in which applications were supposed to be considered for employment for only 120 days, unless renewed by the applicant by a telephone call or visit to the plant. That 120-day policy was not consistently followed, however. Even after 1977, applications were considered for hiring purposes beyond the 120-day period, and they were kept in the general application file for one year.

31. USS personnel clerks and interviewers, with the supervision of Mr. Edwards and Mrs. Williams, were responsible for pulling applications from the general applications files and placing them in the "ready" file. The clerks were instructed to maintain a "good mix" of applications in the "ready" file—that is, the "ready" file was to contain representative applications from each of the EEOC categories so that those called in for interviews would be a racially balanced group. Mr. Edwards testified that he instructed the personnel department employees to see that 20–30% of those interviewed were minorities.

32. USS hired applicants in response to personnel requisitions submitted to the personnel department by the various operating departments. Upon receiving a personnel requisition, USS's personnel clerks or interviewers would select the approximate number of applications from the "ready" file which experience told them was necessary to yield the desired number of hires. These applicants were then contacted and invited to schedule interviews.

33. USS personnel department employees compiled a business record called the Daily Call-In List reflecting the names of applicants scheduled for interviews and the dates of their interviews. After 1974, the Daily Call-In List included a notation of the race of each applicant interviewed.

34. Some applicants scheduled for interviews did not report for the interview and were eliminated from consideration. A record was kept reflecting which applicants did not report for interviews.

35. When an applicant showed up for a scheduled interview, his or her preliminary interview was conducted by a USS personnel department interviewer. The applicant was then interviewed by the foreman or general foreman of the operating department which had requisitioned employees. The foreman or general foreman had the authority to reject the applicant, or to accept him or her, subject to the applicant's successfully completing a physical examination. When a foreman or general foreman turned an applicant down, Mr. Edwards or Mrs. Williams would sometimes review the reasons for the rejection and possibly refer the same applicant to another operating department which needed new employees for another interview.

36. Over the class period, between 50 and 100 USS foremen or general foremen and some 12–15 USS personnel department interviewers interviewed applicants for work at USS. During that period, for example, one foreman conducted some 600 interviews.

37. Although the USS Procedure for Uniform Employment Practices required all interviewers to be trained, USS did not train its interviewers other than through on-the-job exposure to other interviewers' techniques. Nor did USS have any minimum education or work experience requirements for persons hired as interviewers.

38. Despite the requirements in the Procedure for Uniform Employment Practices that "an investigation is to be made of each individual being considered for employment" (P–43, ¶ I), USS made no such investigations.

39. When making hiring decisions, USS's evidence was that its interviewers evaluated applicants using the following hiring criteria: education; work experience; attitude; initiative; personality; ability to take directions; alertness; intelligence; physical fitness (that is, physical restrictions); ability to communicate; military experience or training; vocational training; ability to meet work schedules; prior criminal record; familiarity with industrial or factory work; interest; prior employment history at Fairless Works; personal references; citizenship or alien status; having a relative in the USS work force; and age. Most of these criteria are wholly subjective. As to those criteria which can be objectively measured, such as education and work experience, USS employed no uniform system in assessing one applicant's qualifications vis-a-vis another's. Nor were the various interviewers and foremen trained in any way as to what the different criteria meant or how to implement them uniformly, although many of them are vague and all are subject to differing interpretations.

40. USS took no steps to validate its hiring criteria or to ascertain whether they were job-related.

41. USS's own Procedure for Uniform Employment Practices cautioned against testing applicants for "mental alertness and general ability" unless those factors were demonstrated to be work-related. (P–43, ¶ H.3.)

42. Under consent decrees entered into in the course of prior litigation, USS was bound not to use employee selection criteria "unless such procedures have been validated in accordance with the Equal Employment Opportunity Commission's 'Guidelines on Employee Selection Procedures' (29 C.F.R. § 1607)." (P–112, pp. 431:139 and 431:151.) USS made no attempt to validate its employee selection criteria in accordance with EEOC regulations.

43. USS's Procedure for Uniform Employment Practices requires written documentation of the reasons why any applicant is rejected. (P–43, ¶¶ D.8, G.3, J.3.) The policy requires such documentation "to substantiate conformity with the code of nondiscriminatory treatment ... of applicants," (P–43, ¶ D.3), to provide "a later justification of selection should it be questioned," (P–43, ¶ G.4), and to serve as "check points to insure that the processing described in (P–43) is completed for all new employees" (P–43, ¶ J.3.a). Despite the Procedure's requirement for documenting the reasons an applicant was not hired, USS only unevenly and imperfectly recorded those reasons. Nor did USS's personnel department regularly review the reasons for rejection that were occasionally recorded. Finally, most of those documents which did contain interview comments were destroyed by USS.

44. Contrary to the requirements of its own personnel policies, USS maintained no system to determine whether its subjective hiring criteria were being fairly and nondiscriminatorily applied to all applicants.

45. Applicants who successfully completed the interview procedure were extended job offers conditional upon passing a physical examination.

46. Besides those applicants who were scheduled but did not report for interviews,

some applicants voluntarily withdrew at some stage of the interview/physical-examination process. Others would decline job offers when they were made, or would accept offers but fail to report for work when scheduled.

47. When an individual was hired and reported for work, he or she would be recorded in a business record called the Daily Employment Report (DER). Those who failed to report as scheduled would be logged in with notation "DNS" (for "did not start"). The DER recorded the following information about those hired: pay number; name; starting date; employee status; department; race code; remarks; supervisor; and social security number.

48. USS prepared AAQRs for P & M applicants and hires for the periods January 1, 1972—December 31, 1973 and July 1, 1974—April 30, 1982. The JALs and DERs were key data sources for these reports, which USS filed with the United States Government.

49. USS destroyed thousands of job applications submitted during the portion of the class period prior to 1975, although EEOC regulations require the maintenance, during the pendency of a charge of discrimination, of application forms completed by the unsuccessful applicant and by all other candidates for the same position for which the aggrieved person applied and was rejected. Prior to some point early in 1975, applications which did not result in employment were not retained. USS retained most applications filed thereafter, although some were lost due to clerical error.

50. USS interviewers sometimes used interview sheets to take notes of information gathered during applicant interviews. USS preserved certain interview sheets for successful applicants during the class period, but destroyed all interview sheets for unsuccessful applicants.

51. During the class period, USS conceived of its obligation not to discriminate against racial minorities in hiring as an obligation to hire minorities in proportion to their representation in the work force in Bucks (Pennsylvania), Burlington (New Jer-

sey) and Mercer (New Jersey) Counties. USS's corporate headquarters approved the practice of setting minority hiring goals by reference to the percentage of minorities believed to be in the geographically defined labor market. Over the class period, USS's goals for minority hiring, derived from labor market data relating to the three-county area, varied between 9.5% and 11.5%.

52. USS's personnel department employees reviewed the DER periodically to see what percentage of minorities was being hired. When USS wanted to change the percentage of minorities hired, it would simply change the percentage of minorities scheduled for interviews. For example, Mr. Edwards testified that in 1976, when USS was defending against many charges of race discrimination, and when it was under pressure to increase the number of blacks in its apprenticeship programs in order to meet its obligations under the consent decrees referred to earlier, USS consciously increased the percentage of minorities scheduled for interviews in order to achieve a higher percentage of black hires. It was necessary to increase the number of black laborers in order to increase black representation in the apprenticeship programs because the latter were stocked from the ranks of laborers and other P & M workers. USS in fact achieved a dramatic increase in its percentage of black hires in 1976, as was shown by the statistical evidence discussed below. Mr. Edwards admitted that the increase in black hires in 1976 was not due to USS's receipt of applications from blacks with better qualifications.

53. In setting its hiring goals for minorities, USS paid no attention to the percentage of minorities in the applicant pool.

54. In support of their claim, plaintiffs presented the testimony of a statistical expert, Dr. Samuel Litwin, who analyzed USS's hiring practices. Dr. Litwin's report was plaintiffs' Exhibit 122. Dr. Litwin's studies addressed the question whether the hiring practices and policies of USS during the class period had a statistically significant disparate and unfavorable impact on black applicants.

55. Dr. Litwin's studies were based on the most accurate USS data available. Dr. Litwin received data derived from USS's JALs and DERs in computer-readable form. He and those working under him then verified the accuracy of the data supplied by USS, line-for-line, against the actual JALs and DERs. Where the JALs and DERs did not provide complete information because records had been destroyed, Dr. Litwin used data derived from USS's Affirmative Action Quarterly Reports ("AAQRs") and a document prepared by USS Employee Relations staff assistant Kevin Goodwin in 1978 ("the Goodwin Report"). Finally, Dr. Litwin obtained random samplings of actual job applications from the years after February, 1975 (prior applications having been destroyed), the Daily Call-In Logs, and the "DNS–DNR" file, which listed those applicants who either did not report for a scheduled job interview or did not start work as scheduled after accepting a job offer. These sources were used to supplement and check the reliability of data obtained from the JALs, DERs, AAQRs, and the Goodwin Report.

56. Dr. Litwin included in his studies a correction factor to correct for clerical errors in recording the race code of applicants.

57. Using available USS employment records, plaintiffs established that 49,585 applications for P & M positions were submitted to USS in the period from July 11, 1971 through 1982. Of this total, 12,857 P & M applications, or 25.9%, were submitted by blacks. Information about applications submitted during the years 1973 through 1982 was obtained directly from the JALs prepared by USS. USS destroyed the JAL for 1972. Information about applications submitted during 1972 was therefore obtained from the 1972 AAQRs, which USS prepared from the 1972 JAL and DER for submission to the U.S. Government. Because USS considered applications to be eligible for employment for one year and because the class period for hiring begins on July 11, 1972, the appropriate applicant pool in this case commences with applications filed after July 11, 1971. Information about applications submitted during the last half of 1971 was obtained from the Goodwin Report, a group of documents USS prepared in 1978 from the JALs and other USS records for submission to the EEOC in defense of 43 charges of race discrimination. The Goodwin Report states the number of P & M applications submitted to USS in 1971.

58. The applications data plaintiffs developed from USS business records show, by year, the following number of applications (total and black) submitted for P & M positions:

| YEAR | TOTAL APPLICATIONS | BLACK APPLICATIONS | % BLACK |
|---|---|---|---|
| 1971 (July-Dec.) | 1,210 | 280 | 23.1% |
| 1972 | 3,953 | 801 | 20.3% |
| 1973 | 5,059 | 1,222 | 24.2% |
| 1974 | 8,985 | 1,925 | 21.4% |
| 1975 | 1,328 | 267 | 20.1% |
| 1976 | 7,022 | 2,233 | 31.8% |
| 1977 | 5,119 | 1,389 | 27.1% |
| 1978 | 10,191 | 2,969 | 29.1% |
| 1979 | 6,665 | 1,762 | 26.4% |
| 1980 | 23 | 6 | 26.1% |
| 1981 | 26 | 3 | 26.1% |
| 1982 | 4 | 0 | 0 |
| All Years | 49,585 | 12,875 | 25.9% |

59. Dr. Litwin's data show that, during the class period, USS hired 5,516 persons for P & M positions at its Fairless Works. Of these 5,516 P & M hires, 972—or 17.6%—were black. These figures were obtained directly from the DERs, contemporaneously prepared corporate records of USS hiring activity.

60. The DERs show the number of P & M hires (total and black) at USS for each year in the class period:

| YEAR | TOTAL HIRES | BLACK HIRES | % BLACK HIRES | % BLACK APPLICANTS |
|---|---|---|---|---|
| 1972 (July-Dec.) | 609 | 90 | 14.8% | 20.3% |
| 1973 | 1,781 | 287 | 16.1% | 24.2% |
| 1974 | 1,249 | 164 | 13.1% | 21.4% |
| 1975 | 6 | 2 | 33.3% | 20.1% |
| 1976 | 253 | 107 | 42.3% | 31.8% |
| 1977 | 240 | 63 | 26.2% | 27.1% |
| 1978 | 769 | 147 | 19.1% | 29.1% |
| 1979 | 582 | 111 | 19.1% | 26.4% |
| 1980 | 1 | 0 | 0 | 26.1% |
| 1981 | 26 | 1 | 3.8% | 11.5% |
| 1982 | 0 | 0 | 0 | 0 |
| All Years | 5,516 | 972 | 17.6% | 25.9% (inc. 1971) |

61. The greatest P & M hiring at USS occurred in the years 1972, 1973, 1974, 1978, and 1979. Two-thirds of the class period hiring took place in the years 1972, 1973, and 1974 (3,639 hires); another one-fourth of the class period hiring took place in 1978 and 1979 (1,351 hires). More than 90% of all P & M hiring during the class period took place in 1972–74, 1978, and 1979. Virtually no hiring took place in 1975 (6 hires), 1980 (1 hire), 1981 (26 hires), or 1982 (0 hires). Only moderate hiring took place in 1976 (253 hires) and 1977 (240 hires).

62. Dr. Litwin's data show that, of the 5,516 persons hired into P & M jobs, 5,245—or 95%—were placed in entry-level unskilled laborer positions. Only 258 of the P & M hires—about 4%—were for skilled trade and craft positions. The remaining 13 P & M hires (only 1%) were for positions other than laborer or trade and craft.

63. Dr. Litwin analyzed the P & M applications and hires data by four different methods. Under each method of analysis, Dr. Litwin considered whether USS's hiring practices had a statistically significant disparate and negative impact upon black P & M applicants. Because virtually all applicants possessed the minimum qualifications USS had established for consideration for hire into entry-level P & M jobs [2] (see Finding of Fact No. 17, *supra*), Dr. Litwin's hypothesis was that blacks would be hired into the P & M jobs in proportion to their representation in the applicant pool. However, Dr. Litwin's statistical studies revealed that USS hired blacks into P & M jobs at a rate significantly below their representation in the applicant pool.

64. In his analyses, Dr. Litwin employed 1.64 standard deviations as the measure of statistical significance.

65. Dr. Litwin's first method of analysis (Method "A") examined the fraction of applications submitted by blacks which led to employment and compared it to the fraction of applications from non-blacks leading to employment. Measuring applicants and hires whose race was known, he found that during the class period only 7.6% of the black applications led to employment, whereas 12.9% of the non-black applications led to employment. This meant that at USS applications submitted by non-blacks had a 71% employment advantage over applications submitted by blacks.

66. Conducting the Method "A" analysis for each separate year within the class period, Dr. Litwin found that in the years 1972, 1973, 1974, 1978, and 1979 the fraction of non-black applications which led to employment was considerably larger than the fraction of black applications which led to employment. Dr. Litwin found these disparities to be statistically significant. In 1972, applications submitted by non-blacks had a 47% greater chance of hire than black applications. This advantage to non-blacks was −3.6 standard deviations from its expected value, meaning that the probability that such an advantage to non-blacks occurred by chance was less than 1 in 1,000. In 1973, blacks suffered a 77% disadvantage; in 1974, an 85% disadvantage; in 1978, a 76% disadvantage; and in 1979, a 68% disadvantage. The standard deviations for the years 1973, 1974, 1978, and 1979 ranged from −5 to −11 below the expected values.

67. When Dr. Litwin biased his Method "A" analysis in USS's favor by treating all applicants of unknown race as non-black and all hires of unknown race as black, non-blacks were still found to have statistically significant employment advantages in the years 1972, 1973, 1974, 1978, and 1979.

68. Over all years in the class period, using a weighted average fraction to measure the chances for hire by race, Dr. Litwin concluded that 12.6% of the black applications resulted in hire, whereas 21.6% of the non-black applications resulted in hire. Calculated in this fashion, black applications suffered a 72% overall disadvantage compared to non-black applications. This disadvantage was some 16 standard deviations below its expected value.

2. Although the physical examination requirement may have screened out a significant number of applicants, USS's Mr. Edwards testified that physical examination failures did not occur in a racially disparate pattern. Therefore, this factor is irrelevant to Dr. Litwin's analyses.

69. Dr. Litwin, using a second method of analysis (Method "B"), computed the expected number of black hires (if blacks were hired in proportion to their representation in the applicant pool), and compared it with actual black hires at USS during the class period. For the period from July, 1972, through 1980 (1981 and 1982 were excluded because only 1 black was hired during those years), the number of expected black hires is 1,391. During that time only 971 blacks were actually hired by USS, yielding a shortfall of 420 blacks. This shortfall is more than 14 standard deviations below the expected value.

70. Dr. Litwin employed a third method of analysis (Method "C") to refine his calculations by taking into account when hiring decisions at USS were actually made and when applications were actually submitted. Considering the different dates when applications were actually filed, and using 18 different test assumptions as to the period of time USS considered applications to be active (beginning with the day of submission and ranging up to one year after they were first filed), the computer analyzed daily the percentages of blacks in various applicant pools. Referring to each such applicant pool, the computer then measured the difference between the expected and actual black hires for each of the 2,556 days in the period from January 1, 1973, through December 31, 1979. (This analysis could not be performed for hiring decisions made in 1972, because USS had destroyed the 1972 Job Applicant Log. Nor was it performed for the period 1980–1982, due to the absence of significant hiring activity.) Under all 18 test assumptions, the 18 applicant pools analyzed under Method "C" revealed statistically significant levels of black hiring shortfalls, ranging from shortfalls of 121 blacks to shortfalls of 241 blacks in the periods studied. These shortfalls ranged from 4 to 8 standard deviations below the expected values.

71. When the results of the Method "C" analysis are broken down by year (for the period 1973–1979 covered by this particular study), it appears that blacks suffered statistically significant hiring disadvantages in 1973, 1974, 1978, and 1979. The results of the Method "C" study, therefore, correspond to those obtained through Methods "A" and "B."

72. In a fourth method of analysis (Method "D"), Dr. Litwin further refined his calculations to ascertain for each P & M hire the precise period of delay between the date of application and date of hire. The computer was instructed to recreate exactly who was in the applicant pool during each hiring day when the persons hired submitted their applications. In this way, the timing and racial composition of each day's applicant pool was accurately measured. Once again, this analysis could not be performed for 1972 or the first half of 1973 because USS's destruction of the 1972 applicant log made it impossible to determine the applicant pools for persons hired in 1972 and early 1973.

73. Under Method "D", if applications are deemed to have a lifespan of 26 weeks, the overall black shortfall in P & M laborer hires was 192. This figure represents substantial shortfalls in 1973 (81 blacks), 1974 (82 blacks), 1978 (62 blacks), and 1979 (23 blacks). These shortfalls are statistically significant under Dr. Litwin's assumptions, showing −6.4 standard deviations for 1973; −6.0 standard deviations for 1974; −5.1 standard deviations for 1978; and −2.3 standard deviations for 1979.

74. Using a 52-week lifespan for applications, over the shorter period of January 1, 1974 through the end of 1979, the results show a P & M laborer hiring shortfall of 137 blacks. This is almost 6 standard deviations below the expected value.

75. Dr. Litwin checked the reliability of the data he used for his four principal studies, and tested the soundness of his conclusions, by reference to other data supplied by USS. Specifically, Dr. Litwin used a computer printout prepared by USS listing job applications and other information from 1973 to 1979, the Goodwin Report, and the AAQRs concerning P & M applications and hires. These alternative data sources supported the accuracy of the data used for,

and the conclusions reached by, Dr. Litwin's principal studies.

76. During the class period, USS hired 258 persons for trade and craft, as opposed to entry-level, P & M jobs. Of these, 19— or 7.4%—were black.

77. Dr. Litwin did not perform analyses for trade and craft hires of comparable sophistication to those he performed for P & M hires overall because, prior to 1977, the JALs did not indicate whether an individual applied for a craft job or an entry-level P & M job. Instead, Dr. Litwin simply compared the percentage of black hires for craft jobs with the percentages of blacks in the overall applicant pools for the years within the class period. Although he found statistically significant shortfalls in black craft hiring for 1973 (shortfall of 9 hires), 1974 (shortfall of 10 hires), 1978 (shortfall of 3 hires), and 1979 (shortfall of 5 hires), his analysis does not address the possibility that the proportion of blacks who applied for craft jobs did not correspond to the proportion of blacks in the overall P & M applicant pool.

78. One of defendants experts, Dr. Bernard Siskin, performed a study similar to Dr. Litwin's for craft hires but restricted his study to the years 1977–1979 in order that he might compare black craft hires directly to black craft applications. Dr. Siskin found a shortfall of zero for that three-year period.

79. Dr. Siskin testified that an assumption that proportionately as many black as white applicants were qualified as craftsmen would be unreasonable based on available census data and other information, including USS's JALs for 1977–1979.

80. Mr. Edwards testified that applications from minority craftsmen were rarely received, although actively solicited.

81. Dr. Litwin performed an additional study using the randomly selected applications of 1,566 successful applicants and 4,412 unsuccessful applicants. He found that 21% of successful applicants, but only 9% of unsuccessful applicants, had fathers who were USS employees. This supports an inference that having a father in the USS work force gives an applicant an advantage in the hiring process. Dr. Litwin also found that only 9.7% of successful black applicants had fathers employed at USS, as opposed to more than 26% of successful white applicants. This supports a finding that the practice of giving a hiring advantage to applicants with fathers in the USS work force had a disparate and adverse impact on blacks.

82. USS's work force from 1967 to 1978 was approximately 91.5% non-black.

83. Based on the results of his four distinct methods of analysis and the several data sources he considered, Dr. Litwin reached the firm conclusion that USS's hiring had a statistically significant negative and disparate impact upon blacks during the overall class period, and during each of the years 1972, 1973, 1974, 1978, and 1979. His conclusions were the same whether summer hires were included or excluded, and whether persons of unknown race were included or excluded. His conclusions were the same after adjusting for clerical errors in recording race codes, after adjusting for the possibility that more black applications were recorded in the JALs than non-black applications, and after adjusting for the fact that some persons filed more than one application.

84. Dr. Litwin is a highly qualified statistician, and his presentation and conclusions were credible. The two defense experts who responded to Dr. Litwin—Dr. Siskin and Dr. Finis Welch—confirmed that the analyses Dr. Litwin performed in relation to the overall P & M applicant pool were appropriate, and that the results he obtained were reliable, given his data and assumptions.

85. Defendant attempted to impeach Dr. Litwin's conclusions by attacking the reliability of the data he used.

86. USS cannot in good faith attack the reliability of the JALs, which its own employees prepared as business records of the company, and which the company relied on when it was to its advantage to do so. USS used applicant flow data from the JALs to

defend against numerous EEOC charges of race discrimination in hiring. USS also used applicant flow data from the JALs to prepare its AAQRs for submission to the United States government.

87. The fact that some persons submitted more than one application does not make the JALs unreliable, nor does it affect Dr. Litwin's conclusions. Defendant's expert, Dr. Welch found that a large majority, about 80%, of the applicants did not submit more than one application. With respect to those persons who did submit multiple applications, since USS did not consider applications that were more than one year old, applications from a single person filed more than one year apart over the 10 year class period should be counted separately because each application triggered a separate USS hiring decision. In any event, the submission of multiple applications would be significant only if blacks submitted substantially more multiple applications than non-blacks. Dr. Litwin studied the number of applications filed by each successful black applicant and each successful white applicant. He found no significant difference in the frequency with which blacks and non-blacks submitted multiple applications.

88. Nonetheless, Dr. Litwin's analysis made adjustments for multiple applications. When an applicant was hired, he instructed the computer to delete from the applicant pool all applications submitted by the hired employee. Thus, these multiple applications were not considered when evaluating the racial composition of applicant pools for future hires. In making this correction, Dr. Litwin biased the adjustment in the defendant's favor by assuming that blacks submitted multiple applications more often than non-blacks did. Even with this built-in bias in favor of the defendant Dr. Litwin obtained results consistent with his other studies. Blacks would have to have filed multiple applications with a frequency almost twice that of non-blacks in order for Dr. Litwin's conclusions to begin to be affected. Even at that frequency, the results remain statistically significant overall, and for all individual years in which disparity was found except 1979. There is no evidence to suggest that blacks submit twice as many multiple applications per person as non-blacks.

89. Dr. Welch's method of attempting to determine how many repeated applications were in the JALs, treating as "identical" all persons having the same last name and first initial, is not realistic or accurate. His approach incorrectly counted separate applications filed, for example, by Bob, Bert, Bruce and Bernie Jones as having been filed by one person. His approach improperly treated two applications, submitted by the same person several years apart during the class period, as one application. Dr. Welch admitted that his method overstated the number of multiple applications, improperly treating different individuals as the same, and that it could eliminate more blacks than whites due to fewer spelling errors of black applicants' names in the data.

90. Although Dr. Welch did find a slightly greater frequency of black multiple applications in the JALs when he incorrectly used just the last name and first initial, he also conducted an entirely separate study of multiplicity in the "applications file." There he identified multiple applications by social security number. This study gave a different result, showing that non-blacks filed multiple applications more often than blacks. Dr. Welch conceded that the use of social security numbers was a preferred method of testing for multiple applications. His second study had the effect of actually increasing the percentage of blacks in the applicant pool, and thus the racial disparity, because deletion of multiple applications would eliminate relatively more white applications.

91. The possibility that some applications might have been omitted from the JAL does not make the plaintiffs' employment data unreliable, nor does it affect Dr. Litwin's conclusions. The importance of the JALs is that they establish the percentage of black applications submitted. Missing applications would be pertinent only if proportionately more white applications were missing than black applications.

92. To test the accuracy of the JALs, Dr. Litwin compared actual applications to the JALs to see if each application had a matching JAL entry. Among the applications of persons hired into P & M jobs during the class period, Dr. Litwin found matching entries in the JALs for a very large majority, approximately 85%. Also, using a sample of more than 4,000 unsuccessful applications submitted during the class period, he found matching entries in the JALs for approximately the same percentage.

93. Dr. Welch studied some 30,000 retained applications and found matching entries in the JALs for at least 90–94%.

94. Dr. Litwin's analyses compensated for missing applications for persons who were hired into P & M positions. If he could not find an entry in the JAL for a person hired into a P & M position, he instructed the computer to add to the applicant pool a person of the same race as the person hired. In this way he completely corrected for the missing application. With or without this adjustment, he achieved the same results.

95. Dr. Welch's methods of matching to determine the extent of missing applications among the P & M hires were flawed. Dr. Welch tried to match using computer printouts typed by USS personnel, and not with the raw data itself, that is, the JALs and DERs. On a number of occasions his inability to find perfect matches was due to USS typing errors in the preparation of the printouts, and not due to an omission in the raw data. Moreover, by limiting the lifespan of the applications he wanted to match to only 270 days, he automatically prevented 10% of the hires from being matched because approximately 10% of persons hired had applications more than 270 days old. He obtained an artificially low match rate for 1973 hires by starting to seek matches on February 1, 1973, despite the destruction of the 1972 JAL. This meant that anyone who was hired in 1973, but who applied in 1972, could not be matched. Finally, because Dr. Welch used a computer to do his matching, his results were depressed. A computer, being totally literal, would not match if there was a spelling error, even if the same person was actually in both data sources.

96. Even when Dr. Welch made adjustments to the data for missing applications he still found a statistically significant shortfall in black hiring, according to his report (D–335, p. 52).

97. Most important, none of defendant's experts did studies which found that more unsuccessful white applications than black applications were missing from the JALs. In the absence of evidence of a racial disparity in match rates, missing applications are really a non-issue.

98. Dr. Litwin was the only expert who actually studied whether there was a racial disparity in match rates. He found there was no significant difference in the frequency with which entries for unsuccessful blacks and non-blacks were missing from the JALs.

99. Dr. Welch attempted to show that the employment data Dr. Litwin used were so sensitive that several minor "adjustments" could easily convert Dr. Litwin's demonstrated black shortfall into an excess of black hires. Dr. Welch's proposed adjustments do not undermine the validity of Dr. Litwin's analyses.

100. To support his adjustment theory, Dr. Welch chose only one of Dr. Litwin's 18 applicant pool combinations (D = 0, T = 52). The one he selected yielded a shortfall of 137 blacks, but ignored all of 1972 and 1973. Selection of D = 0, T = 26 would have been more representative, with an overall gross shortfall of 248 blacks during the years 1973, 1974, 1978, and 1979. Thus, Dr. Welch's analysis began by understating the black shortfall and by ignoring two heavy hiring years. Moreover, although Dr. Litwin's Method "D" analysis was the sum of thousands of daily hiring calculations, the adjustments made by Dr. Welch were not. He incorrectly assumed that everyone in the class period was hired at one time.

101. In addition, Dr. Welch's adjustments disregarded the fact that Dr. Litwin

had already adjusted for hires whose applications could not be found in the JALs. Dr. Welch's "minor" adjustment for missing applications in effect added some 30,000 more applications to the JALs, on the unsupported assumption that a high number of unsuccessful applications were missing from the JALs. This adjustment was inconsistent with Dr. Litwin's finding that there are not large numbers of unsuccessful applications missing from the JALs.

102. Dr. Welch admitted that he was not confident of his adjustment for race code errors. Even if he had been, Dr. Welch conceded it would have only a very minor effect. In any event, Dr. Litwin had already accounted for race code errors in his analyses.

103. Dr. Welch conceded that no hard conclusion could be drawn from his adjustments, and he was not willing to vouch for the numbers that they produced.

104. Based on the above, I find that plaintiffs have proved that disproportionately few black applicants were hired for entry-level P & M jobs, overall during the class period and during 1972, 1973, 1974, 1978, and 1979 in particular, in relation to the number of blacks in the applicant pool for these jobs. Based on Dr. Litwin's presentation, I find that the shortfall in black entry-level hiring was statistically significant. (The legal significance of this fact will be discussed in my Conclusions of Law, below).

105. I further find that plaintiffs have not proved that disproportionately few black applicants were hired for trade and craft or other non-entry-level P & M jobs during the class period, in relation to the number of black applicants for these jobs.

106. Besides attacking the reliability of Dr. Litwin's data, USS asserted: (a) that it hired blacks in proportion to their representation in the labor market surrounding the plant; (b) that it did not hire at random to fill entry-level P & M jobs from among all those who met the minimum age, physical condition, and basic literacy requirements but rather sought at all times the "best qualified" candidate for any given opening;

and (c) that any disparity between the percentage of blacks in the applicant pool and the percentage of blacks among those hired was due to the fact that a higher proportion of blacks than whites dropped out during the interviewing process, for one reason or another.

107. Mr. Edwards testified on behalf of USS that throughout the class period, USS sought to hire minorities in percentages sufficient to reflect at least the minority representation in the local labor market. Mr. Edwards and other USS employees decided that the relevant geographic labor market consisted of Lower Bucks County, Pennsylvania, and Burlington and Mercer Counties in New Jersey. Data USS obtained from Pennsylvania's and New Jersey's State Employment Services showed that minority representation in this geographical area was between 9.5 and 11.5 percent during the class period. However, Dr. Welch, defendant's expert, testified that the local work force had 13.5% minorities.

108. The record is clear that, throughout the class period, USS hired minorities for entry-level P & M jobs at rates equalling or exceeding their representation in the geographical labor market defined by USS. (The legal significance of this fact will be discussed in my Conclusions of Law, below.) It is also clear that USS personnel believed that this fact discharged USS's legal responsibility to black applicants under the anti-discrimination laws and insulated USS from liability for discriminating against minorities in hiring.

109. By asserting that it hired only the "best qualified" applicants for entry-level P & M jobs, USS sought to undermine the basic premise of Dr. Litwin's statistical analyses: that, absent discrimination on the basis of race, one would expect black applicants to be hired in roughly the same proportion as their representation in the applicant pool. That premise would be correct, USS asserts, only if USS engaged in random hiring from among all persons who were 18 years of age or older and could pass a physical examination and read safety signs. On the contrary, USS states, the

company puts all applicants through an elaborate application and interviewing procedure designed to determine which are best qualified to perform the physically and mentally demanding work of a laborer in a modern steel mill. According to USS, any discrepancy between the racial make-up of the applicant pool and the pool of those hired may therefore be assumed to be the result of real differences in qualifications between black and white applicants. The list of hiring criteria set forth in Finding of Fact No. 39, *supra,* represents USS's conception of the standards it applied to all applicants in order to determine which were best qualified. USS not only conceded but underlined the subjectivity of the individual criteria as well as of the overall "best qualified" concept. USS emphasized that no single qualification or combination of qualifications would ensure either that a given applicant would, or would not, be hired, and that there was no set formula for balancing the various criteria in making any individual hiring decision.

110. An issue arose at trial as to whether USS would be permitted to supplement the list of its subjective criteria with an additional one, "promotability." For reasons which were adequately set forth in the record at trial, I concluded that defendant had foreclosed plaintiffs from inquiring into the issue of promotability as a hiring criterion during discovery, and I therefore excluded evidence concerning promotability at trial. Because defendant's motion for reconsideration of this evidentiary ruling was left pending at the conclusion of trial, I will take this opportunity to reaffirm it.

Although I stand by my earlier determination that the proffered evidence should be excluded because it would be unfair to allow defendant to assert at trial defenses it had deliberately foreclosed plaintiffs from inquiring into prior to trial, I would also emphasize that I do not believe the excluded evidence would have any effect, one way or another, on my analysis of this case. What is at issue here is the process by which USS hires individuals into entry-level P & M jobs. It cannot be seriously disputed that USS, like any other business

entity, has a right, and perhaps a duty to its stockholders and the national economy, to hire the best qualified personnel it can. It is abundantly clear that ability to absorb on-the-job industrial training (which may be assumed to relate to native intelligence, alertness, and judgment) is an important criterion in determining who is best qualified, even for entry-level jobs. It is also clear that the process by which USS divined who, among its applicants, were the best qualified was wholly subjective, consisting essentially of combining the gut reactions to the applicant of employees in the personnel office and one or more foremen in the plant. No evidence was presented or offered to show that applicants were tested in any way for ability to do specific tasks required of workers above the laborer level. Rather, the evidence was that those hired were expected to learn their initial jobs and any subsequent jobs they might be promoted into through on-the-job training. Given, then, that plaintiffs' statistical evidence showed that blacks were hired at levels significantly disproportionate to their representation in the applicant pool, this question remains: why did USS's wholly subjective process of culling out the "best qualified" applicants select whites for hire significantly more often than blacks, in relation to the racial make-up of the applicant pool? It is this question which I must answer as fact-finder. It is of no help to me to know that entry-level hires are frequently promoted unless there is also evidence that USS's hiring process was designed to, or did in fact, identify which applicants had the greatest ability to absorb on-the-job training, and that black applicants tended to possess this ability to a lesser degree than white applicants.

111. USS presented the testimony of Dr. Joan Haworth, an expert qualified in economics, econometrics, and employment discrimination matters, in support of its contention that it was reasonable for USS to attempt to hire the best qualified applicants. Not surprisingly, Dr. Haworth testified that it was not only reasonable but a necessary business practice for USS to at-

tempt to hire the best qualified applicants. As I have indicated above, I do not believe Dr. Haworth's testimony in this regard was controversial.

112. USS presented the testimony of Dr. Finis Welch, an expert labor economist, in support of its contention that any disparity between the racial composition of the applicant pool and the pool of those hired reflects actual differences in applicants' qualifications rather than racial bias in the selection process. Dr. Welch testified concerning a weighted probit analysis which he performed (the "Winner/Loser study"), statistically analyzing application information about selected successful and unsuccessful applicants to determine whether certain characteristics tended to give applicants an advantage or a disadvantage in hiring. This study purportedly demonstrated that "qualifications count" in hiring, but the study was inconclusive at best.

113. Although two-thirds of USS's hiring during the class period occurred in 1972, 1973, and 1974, Dr. Welch's study did not evaluate applications and hires at any time prior to 1976.

114. Dr. Welch constructed his Winner/Loser study to measure only a handful of the characteristics USS used to make hiring decisions. The study failed to take into account most of the factors USS used in its hiring decisions, such as attitude, initiative, personality, ability to communicate, interest, ability to meet work schedules, prior USS employment, personal references, etc.

115. Dr. Welch's study was based on non-random samples of successful and unsuccessful applications selected from an applications file maintained by USS. Dr. Welch admitted that USS's applications file was incomplete and that the weighting and validity of his entire probit analysis were affected by the incompleteness of his data source.

116. Dr. Welch admitted that he was unable, with the data he possessed, to measure the quality of the applicant's prior work experience, but only the length of employment.

117. Dr. Welch's groupings and weightings of occupational experience were admittedly subjective.

118. The study ignored the work experience of persons employed less than one year, and equated the work experience of all others, whether they had worked one year, or ten years, or twenty years.

119. If the Winner/Loser study revealed anything about what USS looked for in its applicants, it showed that USS's conduct was bizarre. Dr. Welch found that an applicant who had spent 7 of the past 10 years working as a manufacturing operative had no better chance of hire at USS than a person who had never worked a day in his life. He found that an applicant with one year of experience as an assembly line worker in an ice cream plant was *more* likely to be hired by USS than an applicant with 10 years of experience as a steel mill laborer. He found that applicants who had a college degree or some college training had a reduced chance of hire at USS, as did applicants who had clerical experience. Ironically, he found that being white gave an applicant an "edge," that is, an increased probability of being hired.

120. Of the ten variables Dr. Welch analyzed, only one proved statistically significant under all three of the weighting systems he used. That variable was being a "new entrant" to the labor market, which meant that applicants who had never worked before had the most statistically significant advantage in USS's hiring process. He found only two other variables to be statistically significant under any weighting system: having some college education (a disadvantage in hiring), and having manufacturing experience (an advantage). The advantage of manufacturing experience was less statistically significant than the advantage of being a new entrant to the labor market.

121. The Winner/Loser study did not show any relationship between the variables Dr. Welch measured and successful performance on P & M jobs. It did not attempt to determine whether the multitude

of criteria USS used were job-related. Nor did it purport to show that blacks were less qualified than non-blacks, under USS's or any other criteria.

122. Dr. Welch candidly admitted that he lacked confidence in his Winner/Loser study.

123. Numerous problems were identified with the data Dr. Welch used for his Winner/Loser study and other analyses he performed, including the following. He used only a machine-readable listing of applicants, which had been prepared by USS. That applicant listing contained many coding errors for which Dr. Welch made no corrections. The listing contained no information about the job the applicant applied for prior to 1977. Dr. Welch never examined or used the JALs themselves. For information about those hired, Dr. Welch used a computer-readable document prepared by USS from the DERs. He never examined or used the actual DERs. He made no adjustments for errors USS had made in typing the computer-readable DER. His list of persons hired improperly excluded new hires if they had previously worked for USS and improperly excluded summer hires. For some analyses, Dr. Welch improperly included hires at USS's Trenton facility. Finally, in certain calculations Dr. Welch used an "applications file" of retained applications, although it contained no unsuccessful applications filed prior to 1975.

124. The errors in Dr. Welch's data affected the results of his studies, particularly his matching studies of missing applications and his Winner/Loser study.

125. USS also presented the testimony of Robert Talley, an employee in USS's personnel office who was personally involved in making hiring decisions at USS during the class period, in support of its contention that a higher proportion of blacks than whites withdrew voluntarily from consideration during the hiring process or failed their physical examinations. Talley, who made no claim to statistical expertise, studied applicant and hire data for the first part of 1974. Talley concluded that, between December, 1973, and March, 1974, 18.1% of USS's applications came from blacks; that between January, 1974, and June, 1974, 13.2% of those hired were black; but that, in that same six-month period, 17.9% of all "job opportunities" were extended to blacks.

126. Because of numerous problems with his data and his methods, the Talley study is unreliable, and his conclusions may be discounted.

127. Mr. Edwards, Talley's superior in the personnel office, testified that there were no reliable USS records from which rates of applicant drop-outs or failures of physical exams could be determined. He also testified that the phenomenon of "dropping out" during the interviewing process, or after a job offer had been extended, occurred "across the board," and that this did not occur disproportionately often among blacks. Nonetheless, Talley contended that if the higher drop-out and physical-examination-failure rates of blacks were factored in, blacks received their proportional share of job opportunities during the first six months of 1974.

128. The numbers Talley used to make his calculations were both overinclusive or underinclusive. When calculating the number of persons employed in the first half of 1974, he improperly included persons hired to work at USS's Trenton facility. On the other hand, he did not include all of the divisions at the Fairless Hills plant in his data. Moreover, his figures do not include applications submitted by persons seeking summer jobs, although they are members of the class.

129. Talley's calculations improperly compared six months of hires (January to June, 1974) against only four months of applications (December, 1973 to March, 1974). Talley assumed that during this period most applicants USS hired had submitted their applications within 30 days of their employment. Nonetheless, he did not compare June, 1974, hires against May and June applicants, nor May hires against April and May applicants, nor April hires against April applicants. Talley claimed

that to use applicant figures for April, May, or June would have "tainted" the calculations because the JALs, he said, included summer applicants. However, applicants for summer jobs in 1974 were recorded in a separate summer JAL.

130. On rebuttal, plaintiffs showed that, had Talley included the applicant figures for just April and May, 1974, he would have found that 25.1% of the applications submitted between December, 1973, and May, 1974, came from blacks.

131. Even if Talley's analysis, as corrected to include applications submitted in April and May, 1974, were credited, it would not explain the great disparity between 25.1% black applications and 13.2% black hires or even 17.9% black "job opportunities." Nor did USS present any evidence concerning "job opportunities" for any period other than the first half of 1974.

132. Based on all of the above, I find that defendant has not explained the statistically significant shortfall in black hiring for entry-level P & M jobs, vis-a-vis black representation in the applicant pool, during the class period, and particularly during the years 1972–74, 1978, and 1979.

133. There is no evidence from which I could find that any of the USS personnel office employees who testified harbor animus against blacks or are likely to have intentionally discriminated against black applicants.

*Conclusions of Law*

1. Plaintiffs having failed to present any evidence in support of Elbert Green's individual claim of disparate treatment, defendant is entitled to judgment in its favor on this claim.

2. Plaintiffs having failed to present any evidence in support of Robert Danley's individual claim of disparate treatment, defendant is entitled to judgment in its favor on this claim.

3. Plaintiffs having failed to present any evidence in support of the claims of class members who unsuccessfully sought employment during the class period in USS departments other than the P & M department, defendant is entitled to judgment in its favor on these claims.

4. Plaintiffs having failed to demonstrate that defendant hired disproportionately few blacks for trade and craft or other skilled P & M jobs, relative to the number of blacks who applied for and were qualified for such jobs, they have failed to make out a prima facie case that the defendant discriminated against class members in hiring for non-entry-level jobs.

5. Plaintiffs have failed to make out a prima facie case that the defendant discriminated against class members in hiring for P & M jobs during the years 1975–77, 1980, and 1981. As plaintiffs' proof of discrimination rested on statistics, no discrimination may be found in those years in which, according to plaintiffs' own proof, blacks were hired at rates equally or exceeding their representation in the applicant pool, or in those years in which so little hiring was done that no valid conclusions can be drawn from the statistical evidence.

6. Plaintiffs established a prima facie case that the defendant discriminated against class members in hiring for entry-level P & M jobs during the years 1972–74, 1978, and 1979 by their statistical proof that the defendant's hiring practices during those years had a statistically significant disparate and adverse impact on blacks.

*Discussion*

Plaintiffs' burden in establishing a prima facie case of discrimination under the disparate impact model is to show "that an employer's selection process results in the rejection of a disproportionate number of members of a protected group." *Connecticut v. Teal,* 457 U.S. 440, 102 S.Ct. 2525, 2537 n. 3; 73 L.Ed.2d 130 (Powell, J., dissenting) (1982). The disparate impact model of proof may be applied to "practices which are facially neutral in their treatment of different groups but in fact fall more harshly on one group than another and cannot be justified by business necessity." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977). No

proof of discriminatory intent is required under the disparate impact model. Rather, plaintiffs need only prove that the defendant's hiring practices "select applicants for hire ... in a racial pattern significantly different from that of the pool of applicants." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975).

 Aside from attacking the reliability of plaintiffs' data (which attack I have rejected in my Findings of Fact, *supra*), defendant has raised two legal arguments against plaintiffs' efforts to establish a prima facie case of disparate impact. First, defendant asserts that the disparate impact model is inapplicable where the selection process challenged employs multiple, subjective criteria. Second, defendant asserts that relevant labor market data, rather than applicant pool data, should be used to determine whether blacks were in fact adversely affected by the challenged hiring process. Both of these arguments must be rejected as contrary to authority and the policies underlying Title VII.

Defendant's contention that the disparate impact model may be used only to challenge a single, objective employment criterion is supported by a sole case, *Pouncy v. Prudential Insurance Co.,* 668 F.2d 795 (5th Cir. 1982). *Pouncy* is distinguishable, in that the court's rejection of the disparate impact model in that case was based on the plaintiff's failure to give the employer adequate notice of what employment practice was being attacked, so that it could prepare its defense. *Id.* at 801.

Moreover, any contention that plaintiffs using the disparate impact model must limit themselves to attacking a single, objective criterion is contrary to the rationale of the Third Circuit's recent decision in *Wilmore v. City of Wilmington,* 699 F.2d 667 (3rd Cir. 1983). In *Wilmore,* the court sustained a class-action challenge to promotional criteria for firefighters, stating that:

> (T)he barrier to equal employment opportunities here is not so much the isolated tests as it is the overall process firefighters undergo to achieve promotion.

*Id.* at 671.

Finally, the *Pouncy* court's maverick assertion that the many cases which have approved use of the disparate impact model to challenge subjective, multiple-criteria hiring or promotional systems have been "incorrect," 668 F.2d at 800, was not supported by any case authority.

The leading case disapproving of the unguided use of subjective criteria to the disproportionate disadvantage of blacks is still *Rowe v. General Motors,* 457 F.2d 348, 356–59 (5th Cir.1972). *Rowe* and the numerous cases which have followed it[3] have recognized that, while subjective criteria are not illegal *per se* under Title VII and may be useful and necessary, they are suspect when their application leads to the disproportionate rejection of candidates from a protected group. Particularly when relatively vague subjective standards are given to a large

---

**3.** A long string of cases after *Rowe* have inferred racial discrimination from evidence that application of subjective standards resulted in the allocation of proportionately fewer benefits to blacks than to whites. Courts have been most willing to infer improper application of subjective standards where the standards themselves are vague and not clearly related to the job, and where there is no review of an immediate supervisor's evaluation by higher levels of management. *See, e.g., Fisher v. Procter & Gamble Mfg. Co.,* 613 F.2d 527, 545–46 (5th Cir.1980), *cert. denied,* 449 U.S. 1115, 101 S.Ct. 929, 66 L.Ed.2d 845 (1981); *Robinson v. United Carbine Corporation,* 538 F.2d 652, 661–62 (5th Cir.1976), *modified on procedural grounds,* 544 F.2d 1258, *cert. denied,* 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 78 (1977); *Senter v. General Motors Corp.,* 532 F.2d 511, 529–30 (6th Cir.), *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976); *Rogers v. International Paper Co.,* 510 F.2d 1340, 1350–51 (8th Cir.), *vacated and remanded on other grounds,* 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975); *Muller v. U.S. Steel Corp.,* 509 F.2d 923, 927–28 (10th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975); *Randolph v. U.S. Elevator Corp.,* 452 F.Supp. 1120, 1125–26 (S.D.Fla.1978); *Dickerson v. U.S. Steel Corp.,* 439 F.Supp. 55, 81 (E.D.Pa.1977); *Sarocini v. Missouri Pacific Ry. Co.,* 431 F.Supp. 389, 393–94 (E.D.Ark.1977). *Cf. Pate v. Transit District,* 21 FEP 1227, 1237 (N.D.Cal.1977) (standards were vague and subjective but disparate effect was more likely due to seniority).

number of individuals to be applied in whatever manner they see fit, with no systematic review to ensure fairness, the chances are great that conscious or unconscious racial bias on the part of some of those individuals will tinge the selection process. The problem with a selection system which employs largely subjective criteria is that its very vagueness makes the fairness of its application difficult to assess on a decision-by-decision basis. In fact, the results of such a system are virtually unreviewable unless discrimination may be inferred from racially disparate results. If defendant were correct in its legal position, relying on *Pouncy,* any employer could immunize its hiring, promotional and lay-off selection systems from class-action attack simply by making them as standardless as possible, by diffusing responsibility for making employment decisions among as many individuals as possible, and by failing to review the results of those individuals' exercise of discretion. As *Rowe* and its progeny have recognized, it is precisely in this sort of setting that discrimination is most likely to occur.

In this case, plaintiffs [4] proved that they are black; that they applied for jobs for which they possessed the minimal qualifications; that they were rejected, although others were hired; and that the hiring selection process under which they were rejected selected blacks for hire significantly less often than whites, in comparison to the racial make-up of the applicant pool. Further refinement of plaintiffs' definition of the hiring selection system they attack was made impossible by defendant's own refusal to be pinned down as to the selection criteria it employs, beyond listing the twenty subjective criteria set forth in Finding of Fact No. 39 and stating that these criteria were applied as an "amalgam." Under these circumstances, I conclude that plaintiffs have made out a prima facie case of disparate impact, and that it is fair to turn to the defendant for some justification of a selection process which produces apparently discriminatory results.

USS has attempted to convince the Court that plaintiffs had the burden, as part of their prima facie case, of presenting evidence that rejected black candidates were as, or better, qualified for entry-level P & M jobs as the successful white candidates for those jobs. The very amorphousness of defendant's hiring selection system, however, relieves plaintiffs of any greater burden with respect to demonstrating their own qualifications than they have carried. Defendants have established that the only *minimum* criteria for an entry-level P & M job were the age, physical condition, and basic literacy requirements that virtually all applicants presumptively possessed. From those who met these minimum criteria, defendant attempted to cull those it considered the "best" qualified. Defendant steadfastly refused to identify any single attribute or combination of attributes that would assure, or nullify, a minimally qualified applicant's chances of being hired. Had defendant identified such attributes, plaintiffs would have had to present proof that they possessed them (or did not possess them, in the case of negative attributes) as part of their prima facie case. It would obviously be impossible, however, for plaintiffs to present proof that they possessed as much or more "personality," "attitude," "alertness," "intelligence," "ability to communicate," and so forth, as those terms were understood and applied by defendant's various personnel interviewers and foremen, than the successful white applicants. Carrying defendant's argument to its logical conclusion, the mere fact that certain candidates were successful proves that they possessed more of the desired qualities, as subjectively measured by defendant's own employees, than unsuccessful candidates. In other words, if I accepted defendant's argument, its selection process would be self-validating.

4. In this instance I am referring to those plaintiffs whose applications were active during the years in which statistically significant shortfall in black entry-level hires occurred—1972–74, 1978, and 1979.

Defendant's second argument—that labor market data, rather than information about actual applicants, is the preferred standard for determining whether its hiring practices had a disparate impact on blacks—requires little comment. While some courts have permitted plaintiffs to use labor market data to establish disparate impact where information about actual applicants was unavailable, or where applicant flow data understated minority availability due to the defendant's discouragement of minority applications, actual applicant flow data is the preferred yardstick because it compares those actually hired to those who actually offered themselves for hire, rather than to a hypothetical pool of those "available" within a circumscribed geographical area. *See, e.g., United States v. County of Fairfax, Va.,* 629 F.2d 932, 940–41 (4th Cir. 1980); *Hester v. Southern Railway Co.,* 497 F.2d 1374, 1379 (5th Cir.1974).

7. Defendant having failed to rebut plaintiffs' prima facie case of disparate impact in hiring for P & M laborer jobs in 1972–74, 1978, and 1979, plaintiffs are entitled to partial judgment in their favor on the issue of liability under Title VII.

*Discussion*

The plaintiffs having established a prima facie case of disparate impact, the burden shifted to the defendant to explain the disparity. I have explained my reasons for rejecting defendant's proffered explanation that blacks "dropped out" from the selection process more frequently than whites in my Findings of Fact and will restrict my comments here to the legal deficiencies of defendant's proof that it hired the "best qualified."

Defendant could not, of course, be found to have violated Title VII, whatever racially disparate impact its selection process produced, if the disparate impact were shown to be the result of the defendant's preferring better qualified candidates. The defendant, like any employer, has an absolute right to hire the best laborers it can find for its steel plant. The fatal deficiency in defendant's presentation of its proof in this case, however, is that it presented no evidence from which I could reasonably conclude that blacks, on the average, are less qualified to be laborers in steel mills than whites, and that defendant's selection process fairly determined this to be so. To the extent defendant's argument suggests I should take judicial notice of the inferior qualifications of blacks, it is morally and legally offensive.

■ It is not enough for the defendant simply to invoke the "best qualified" standard as a defense. In order to rebut a prima facie case of disparate impact, a defendant must demonstrate that the challenged selection criteria have "a manifest relationship to the employment in question." *Connecticut v. Teal,* 457 U.S. 440, 102 S.Ct. 2525, 2531, 73 L.Ed.2d 130, *quoting Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). This means that a showing must at least be made that the criteria employed to define who was "best qualified" did in fact correlate with superior performance on the job and that the defendant's selection process accurately measured the degree to which applicants possessed the desired qualifications. The fact that members of the plaintiff class possessed the desired job-related qualifications to a lesser degree than non-members might reasonably be inferred from proof that fair and neutral application of demonstrably job-related hiring criteria resulted in the hiring of proportionately fewer class-members.

The defendant presented, through the expert opinion testimony of Dr. Haworth, evidence that its "best qualified" hiring standard, consisting of about twenty subjective criteria applied as an "amalgam," was a reasonable and necessary business practice. Dr. Haworth did not address, however, whether the defendant accurately measured the extent to which applicants were qualified, or whether its system was designed to ensure fair and racially neutral application of those criteria. The evidence, on the contrary, was that application of defendant's "best qualified" criteria was left to up to 100 plant foremen, general foreman, and personnel office interviewers and clerks;

that no systematic efforts were made to train these individuals in neutral application of the criteria, or to review the fairness of their decisions; and that, under the name of applying the "best qualified" standard, each individual decision-maker essentially simply consulted his or her "gut level" reaction to an individual applicant. Moreover, the one safeguard against discrimination that was built into the system—the requirement that a written record be kept of the reasons for an applicant's rejection—was largely ignored.

The defendant also attempted to present proof, in the form of Dr. Welch's Winner/Loser study, that differences in qualifications, rather than race, determined which applicants were successful. The shortcomings of this study are discussed in detail in my Findings of Fact. I will note here only that Dr. Welch's study did not even purport to demonstrate that those factors he identified as giving an applicant an "edge" were accurate predictors of success on the job.

The defendant's practice of preferring applicants with a relative in the USS workforce is an example of a seemingly non-job-related criterion which the defendant made no effort to validate. Another is the statistically significant "edge" factor, identified by Dr. Welch's Winner/Loser study (to the extent it is entitled to any credence), of being a new entrant to the labor market. Others of defendant's criteria—"ability to take directions," "alertness," "intelligence," and "ability to communicate," for example—would seem intuitively to be related to ability to absorb on-the-job and classroom instruction, an important and legitimate job qualification for entry-level P & M workers, who are expected to learn all or most necessary job skills after they hired, directly from the employer. Yet these criteria are perhaps the vaguest and most subjective of all on defendant's list, and there is no evidence that the numerous interviewers and foremen entrusted with the task of determining whether applicants possessed them

were able or, in all cases, willing to do so in an accurate and unbiased manner.

The fact that plaintiffs' statistical proof did not reveal a disparate impact on blacks in every year during the class period—while it might seem at first blush to belie the inference that defendant's subjective hiring process masked subtle and perhaps unconscious discrimination against black applicants—actually supports that inference when considered in the light of defendant's own explanation for the dramatic rise in the rate of black hires which occurred in 1976.[5] Defendant's witnesses testified that the percentage of black applicants called in for interviews in 1976 was subjected to a deliberate and substantial increase, with the aim of increasing the number of black P & M laborers who would thereafter become eligible for defendant's apprenticeship programs. The principal motive behind this action, as defendant frankly conceded, was to enable it to meet its obligations under previously entered consent decrees to increase minority representation in its apprenticeship programs. Not surprisingly, defendant succeeded in achieving a greatly increased percentage of blacks hired in 1976. In fact, 42.3% of the 253 applicants hired in P & M in 1976 were black. Defendants witnesses did not contend that they suddenly started to receive applications from better qualified blacks in 1976, or that they hired unqualified blacks in order to meet affirmative action goals that year. Rather, the events of 1976 demonstrate that defendant was capable of increasing the percentages of qualified blacks hired to equal or exceed black representation in the applicant pool by simply adjusting the call-in rates. This undercuts defendant's contention that the disproportionately low rate of black hires in other years was due to the inferior qualifications of black applicants.

Interestingly, when the pressure to meet consent decree goals lessened after 1976, the rate of black hires quickly sank back

---

**5.** The extremely small number of total hires which took place in 1975 (6 hires, 2 black hires), 1980 (1 non-black hire), and 1981 (26 hires, 1 black hire) make it unnecessary to consider those years.

nearly to its former level. In 1977—which, like 1976, was a fairly light hiring year—the percentage of black hires was slightly below the percentage of black applicants. By 1978, when hiring increased, shortfall in black hires was once again occurring at statistically significant levels.

■ In light of defendant's failure to rebut plaintiffs' prima facie case of disparate impact, the plaintiff class is entitled to judgment in its favor as to the Title VII claims of class members who sought P & M laborer jobs during the years 1972–74, 1978, and 1979.

8. Plaintiffs have failed to make out a prima facie case of class-wide disparate treatment in violation of Title VII or intentional discrimination in violation of 42 U.S.C. § 1981.

*Discussion*

Plaintiffs' alternate disparate treatment claim, under both Title VII and § 1981, is based on the theory that USS's use of relevant labor market data, instead of applicant flow data, to set its minority hiring goals constituted the intentional setting of a discriminatory quota to limit black hires.

■ Plaintiffs burden in a class-wide disparate treatment claim is to prove that the defendant intentionally and habitually discriminated against blacks on the basis of their race. Proof of intent is crucial, and the discriminatory intent which must be proved "implies more than intent as volition or intent as awareness of consequences. . . . It implies that the decision-maker . . . selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Mass. v. Feeny,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (footnotes and citation omitted). "That an employer was aware of, or totally indifferent to, the racially discriminatory impact of its hiring

policies is not of itself sufficient to establish a prima facie case and shift the burden of explanation to the defendant." *Gay v. Waiters' and Dairy Lunchmen's Union,* 694 F.2d 531, 552 (9th Cir.1982).

It is undisputed that defendant deliberately set its hiring goals for minorities on the basis of relevant labor market data, even though it was aware of the higher proportion of blacks in the applicant flow. It is also clear, at least to me, that the USS personnel office officials who set these hiring goals, with the approval of corporate management, did so in the sincere, though erroneous, belief that they were fulfilling the company's obligations under the antidiscrimination laws thereby, and not with any invidious purpose of disadvantaging black applicants.

The question presented, then, is whether plaintiffs can make out a case of intentional discrimination by means of statistical proof that a defendant's hiring practices had a disparate and adverse impact on blacks, together with proof that responsible officials of the defendant were aware of the statistical facts but ignored them, not because they wanted to disadvantage black applicants, but because their mistaken view of the law led them to believe that the statistics in question were irrelevant to the issue whether their hiring practices had a disparate impact on blacks.

■ Following the pronouncement of *Gay v. Waiters' and Dairy Lunchmen's Union, supra,* that mere indifference to the discriminatory impact of hiring policies is insufficient to establish a prima facie case of intentional discrimination, I conclude that plaintiffs' proof is insufficient. This is not a case like *Gay,* in which plaintiffs did not have access to the disparate impact model of proof and were forced to attempt to create an inference of discriminatory intent directly from statistical evidence of disparate impact.[6] Rather, plaintiffs here

---

**6.** The burden of such plaintiffs is high. While statistical evidence of discriminatory impact is "an important starting point" in the inquiry whether the facts permit a legal inference of discriminatory intent, it is "rarely sufficient of

itself." *Gay,* 694 F.2d at 552, *citing Village of Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The plaintiff relying on statistical proof must show a stark pattern of gross dispa-

confine their use of the disparate treatment theory to challenging defendant's alleged setting of a quota to limit the total percentage of black hires. However, the defendant's lack of a hostile, discriminatory motive is unchallenged on this record. Plaintiffs have produced no evidence from which I could reasonably conclude that defendant's intent was other than to follow the dictates of the law, as it misunderstood them. This is not the "discriminatory intent" which must be proved in a Title VII disparate impact case or a § 1981 case.

rate impact, as "statistics demonstrating that chance is *not* the more likely explanation are not by themselves sufficient to demonstrate that race *is* the more likely explanation for an employer's conduct." *Gay,* 694 F.2d at 552–53. *Cf. Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239 (3rd Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975) (statistical proof that only 2 out of 3,129 claims adjusters hired during class period were women held sufficient to make out prima facie case of sex discrimination).